# EXHIBIT "B"

## CITI MERCHANT SERVICES
## BANKCARD ADDENDUM TO MASTER SERVICES AGREEMENT

This Merchant Services Bankcard Addendum ("Bankcard Addendum") is among the CUSTOMER identified above, CITICORP PAYMENT SERVICES, INC ("CPSI" or "BANK") and FIRST DATA MERCHANT SERVICES CORPORATION ("FDMS") (CPSI and FDMS are collectively referred to as "SERVICERS"). The terms of the Master Services Agreement between FDMS and CUSTOMER are incorporated herein and the parties hereto agree to be bound by such terms.

CPSI, as a wholly-owned operating subsidiary of a member of Visa U.S.A., Inc. ("VISA") and MasterCard International Incorporated ("MasterCard") (VISA and MasterCard, collectively, the "Associations" or "Bankcard Associations"), is a licensee of the Bankcard Associations permitting it to acquire VISA and MasterCard transactions and has sponsored FDMS with the Bankcard Associations as a "Member Services Provider" (as defined in the Bankcard Association Rules). Accordingly, FDMS shall perform certain functions in connection with authorization, processing and settlement for Customer hereunder. As between themselves, the respective rights and obligations of FDMS and CPSI shall be governed by the agreements between them and/or their parent entities and Bankcard Association Rules. Customer acknowledges that, notwithstanding anything contained in any or all of this Bankcard Addendum (which includes the Annex(es), Operating Procedures, attachment(s), schedule(s) or supplement(s) referred to herein or amendments to any of the aforesaid) to the contrary, CPSI's obligations hereunder shall be limited to the sponsorship and settlement of certain Card transactions submitted in accordance with the terms and conditions of this Bankcard Addendum and the Bankcard Association Rules, and CPSI shall not have any obligation or liability of any nature in connection with any and all debit or EBT transactions or related services or any services of any kind provided by FDMS or its affiliates provided hereunder or pursuant hereto.

In consideration of the mutual covenants and agreements set forth herein and other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, SERVICERS and CUSTOMER agree as follows:

1. **Definitions.** As used in this Bankcard Addendum, capitalized terms will have the meaning set forth in Annex 1.

2. **Services.**
   2.1 During the term of the Bankcard Addendum, CUSTOMER shall use SERVICERS as its exclusive provider of all Services for CUSTOMER.
   2.2 Subject to Association Rules, Services may be performed by FDMS or BANK subject to the agreements between them as the same may be modified from time to time. In addition to SERVICERS, one or more affiliates of SERVICERS may assist in providing terminals or other equipment and local support functions in connection with this Bankcard Addendum provided that SERVICERS shall at all times remain responsible for the acts and omissions of such Affiliates.

3. **Acceptance of Cards.**
   3.1 CUSTOMER will accept any Card properly tendered, without imposing any special conditions not required or allowed by Association Rules. CUSTOMER will assess no special charge or extract any special agreement, condition (including any minimum or maximum transaction amounts) or security from a Cardholder in connection with any Card transaction. CUSTOMER shall not post signs indicating that CUSTOMER will refuse to honor Card transactions below or above a specified amount. CUSTOMER may offer a discount for using cash if clearly disclosed as a discount from the price available for all other means of payment. CUSTOMER shall not engage in acceptance practices or procedures that discriminate against, discourage or favor the offered use of any particular Card accepted by CUSTOMER. CUSTOMER will not require Cardholders to provide personal information such as a home or business telephone number, a home or business address, or any form of identification (such as a driver's license) as a condition for honoring and accepting a Card, unless specifically required by this Bankcard Addendum or the applicable Association for verification of identity. If applicable, CUSTOMER shall not accept Cards at terminals that dispense scrip (i.e. an apparatus and method for dispensing paper media is disclosed) in violation of the Association Rules.

3.2 CUSTOMER must check each Card accepted for validity in accordance with the terms of this Bankcard Addendum, the Operating Procedures and the applicable Association Rules. CUSTOMER must not submit any sale that was not created between the CUSTOMER and the Cardholder for settlement and under no circumstances may a CUSTOMER submit any sale that has been previously charged back by the Cardholder and returned to CUSTOMER.

3.3 CUSTOMER will check each Card used during a transaction for validity in accordance with the terms of this Bankcard Addendum, the Operating Procedures and the applicable Association Rules. CUSTOMER will not honor a Card that appears to be invalid or expired.

3.4 All Sales Drafts and Credit Vouchers must include (i) either a manual imprint or an electronic printing of the Card obtained by passing the magnetic stripe on the Card through a point-of-sale terminal, of Cardholder information contained on the Card or magnetic stripe; (ii) the signature of the authorized user as it appears on the Card; (iii) the date of the transaction; (iv) a description of the merchandise sold or rented or the services rendered; and (v) the total cash price of the Card transaction (including taxes).

3.5 Except for transactions completed by using magnetic stripe reading point-of-sale terminals that print Card transaction records or originated at limited amount terminals that are capable of reading magnetic stripes and limit each Card transaction to twenty-five ($25), CUSTOMER is deemed to warrant the true identity of any Cardholder unless CUSTOMER imprints the Card on the Sales Draft, as described in subsection 3.4, above.

3.6 Unless a Card transaction is governed by Section 6, Section 9 or otherwise specifically authorized by SERVICERS in writing, CUSTOMER may only complete a Card transaction when (i) the Card is present and (X) the data stored on the magnetic stripe is electronically read and printed by a magnetic stripe reader or (Y) the Card is manually imprinted, (ii) the Card is signed and the signature on the Sales Draft appears to be the same as the signature on the Card, (iii) the Cardholder resembles the person pictured (if any) on the Card, and (iv) all, or the appropriate portion, of the embossed account number on the Card matches with the corresponding digits printed on the Card and with the account number displayed and/or printed by a point-of-sale device reading the magnetic strip on the Card. (If a previously unsigned Card is signed at the time of a Card transaction, CUSTOMER will review (and identify on the Sales Draft) a current, official government identification document (such as a driver's license or passport) bearing the Cardholder's signature.) CUSTOMER will deliver at least one copy of the Sales Draft or agreement or Credit Voucher to the Cardholder.

4. **Operating Procedures; Association Rules.**
CUSTOMER acknowledges that it has received the Operating Procedures, the terms of which are incorporated into this Bankcard Addendum. CUSTOMER agrees to follow the procedures in the Operating Procedures in connection with each Card transaction and to comply with all applicable Association Rules. From time to time, SERVICERS may change the Operating Procedures, in whole or in part, and other operating procedures, by providing CUSTOMER with at least thirty (30) days' prior written notice of the change. However, in the event of changes in the Association Rules or due to security reasons, certain changes in Card procedures may become effective on shorter notice. If there is any conflict between the terms of this Bankcard Addendum and the Operating Procedures, the terms of this Bankcard Addendum will govern, unless the conflict is directly related to a change in the Operating Procedures which specifically addresses a procedure or requirement detailed in this Bankcard Addendum. If CUSTOMER loses or otherwise misplaces the Operating Procedures or notices of changes thereto, CUSTOMER shall be responsible for contacting SERVICERS to obtain replacement copies.

5. **Authorization.**
5.1 CUSTOMER shall be responsible for obtaining Authorization in advance for each Card transaction. The Authorization number provided by SERVICERS shall be noted by CUSTOMER in the appropriate place on the Sales Draft. If Authorization is declined, CUSTOMER shall not complete the Card transaction.

5.2 CUSTOMER shall comply with any special authorization procedures contained in any other sections of this Bankcard Addendum, the Operating Procedures the Schedules and the Association Rules.

5.3 CUSTOMER acknowledges that Authorization, (i) indicates only the availability of credit at the time of Authorization; (ii) does not warrant that the person presenting the Card is the rightful

Cardholder; and (iii) is not an unconditional promise or guarantee by SERVICERS that any Card transaction will not be subject to Chargeback.

5.4  CUSTOMER may, as permitted in this Bankcard Addendum and for an additional fee, obtain a voice authorization or manually enter the transaction, in the event that the POS Terminal is not operating properly. SERVICERS will provide CUSTOMER with an approval number for voice authorized transactions and CUSTOMER shall record such approval number on the Sales Draft.

5.5  SERVICERS shall have no obligation to process any transactions initiated with a Card type not selected by CUSTOMER on the Application and SERVICERS shall be entitled to decline such transactions without first attempting to obtain an authorization. In the event any such transaction is inadvertently not declined by SERVICERS and is authorized by a card-issuing organization, Credit Card Association, or Network, CUSTOMER shall be fully liable for each transaction, as if the Card type initiating in such transaction was selected by CUSTOMER on the Application.

6.  **Telephone and Mail Orders.**

6.1  If CUSTOMER is authorized to accept telephone or mail orders, Authorization for each such Card transaction, regardless of the face amount, must be obtained and CUSTOMER must write "TO" (indicating telephone order), or "MO" (indicating mail order) as applicable, on the Sales Draft in lieu of the Cardholder's signature. CUSTOMER assumes all responsibility for identification of the Cardholder and the validity of the Card Information for telephone and mail orders. For telephone and mail order Card transactions where merchandise is to be shipped or delivered to or for the Cardholder, the shipping date shall not be more than five calendar days after the Authorization is obtained, and any shipping costs not included in the Authorization amount must not exceed fifteen percent (15%) of the amount authorized.

6.2  An installment payment option may be offered for telephone or mail order merchandise if all terms are clearly disclosed, each installment is authorized, the first installment is not submitted for settlement until the merchandise is shipped, and subsequent installments are submitted no more frequently than monthly.

6.3  Under no circumstances may CUSTOMER require that a Cardholder complete a postcard or other document which displays the Cardholder's account data in plain view when mailed.

7.  **Multiple Sales Drafts and Partial Consideration.**

7.1  Except as shall be specifically set forth in the Operating Procedures or the Association Rules, CUSTOMER shall list all items of goods and services purchased during each Card transaction and the total amount thereof on a single Sales Draft.

7.2  CUSTOMER shall comply with all special procedures and conditions applicable under the Operating Procedures and the Association Rules with respect to any partial payment, installment payment, delayed delivery or advance deposit situation and any delayed or amended charges for a travel and entertainment transaction. CUSTOMER shall not use more than one Sales Draft to represent a single Card transaction to avoid the need for Authorization.

8.  **Preauthorized Orders and Recurring Sales.**

8.1  A Preauthorized Order or Recurring Sale may include the payment of recurring charges such as insurance premiums, subscriptions, membership fees, tuition or utility charges and may also include preauthorized health care payments (subject to a Schedule).

8.2  If CUSTOMER is authorized to accept Preauthorized Orders or Recurring Sales, Authorization for each such Card transaction, regardless of the amount, must be obtained and CUSTOMER must write "Recurring Transaction" (for Visa and other non-MasterCard Card transactions) or "PO" (for MasterCard Card transactions) as applicable, on the Sales Draft in lieu of the Cardholder's signature.

8.3  Except for preauthorized health care payments for the incremental costs not covered by insurance, advance deposits and installment payments, all made in compliance with this Bankcard Addendum and the Operating Procedures and Association Rules, a Preauthorized Order or Recurring Sale may not include partial payments made to CUSTOMER for goods or services purchased in a single transaction. In no event may any finance charges be imposed on any periodic payments in connection with a Preauthorized Order or Recurring Sale.

8.4  CUSTOMER may not accept a Preauthorized Order or Recurring Sale from a Cardholder for the purchase of goods or services which are delivered or performed periodically unless the Cardholder completes and delivers to CUSTOMER a written request (and, when applicable, a

written renewal request) identifying (i) the goods or services to be charged to the Cardholder's account, (ii) the amount of the preauthorized or recurring charges (unless such charges are for variable amounts), (iii) the frequency of the preauthorized or recurring charges and (iv) the duration of time for which the Cardholder's permission is granted.  If CUSTOMER accepts any Preauthorized Orders or Recurring Sales for variable amounts, CUSTOMER must comply with the supplemental provisions set forth in the applicable Schedules.

8.5  The Cardholder's written request (including any written renewal request) must be (i) retained for the duration of the preauthorized or recurring charges; (ii) provided in response to a Card issuing bank's request for original documentation; and (iii) used no longer after receiving notice of cancellation.

9.  **Internet Processing.**

CUSTOMER must obtain approval from SERVICERS to accept and process Internet transactions through SERVICERS. CUSTOMER also acknowledges that it must inform SERVICERS of its use of any processing software, third party Internet payment gateway, shopping cart, Web Site host, or other service provider (collectively "Internet Service Providers"), that any Internet payment gateway must be approved by SERVICERS and that CUSTOMER is prohibited from transmitting any cardholder transaction data to any Internet Service Providers (or any third party) without the approval of SERVICERS. If CUSTOMER accepts Internet transactions without such approval, SERVICERS may, in addition to any other rights it may have under this Bankcard Addendum, establish a chargeback reserve account to protect them from risk of loss.   If authorized to accept payment by Internet, the Sales Draft shall be completed without the Cardholder's signature or an imprint but shall include the Cardholder's name, billing address, Card number, expiration date, of the Card, a description of the merchandise or service and the date and amount of all charges.  All Internet transactions will be settled by SERVICERS into a depository institution in the United States. CUSTOMER shall process Internet transactions only (a) if the Internet transactions have been encrypted by SERVICERS or by an Internet Service Provider approved by SERVICERS and (b) Cardholder data is protected by CUSTOMER as required by the then–current Association Rules, PCI data security requirements, or any other applicable regulations.  Encryption is not guarantee of payment to CUSTOMER.  CUSTOMER acknowledges that Internet transactions may be authorized and settled through separate BIN/ICA numbers and interchanges and that SERVICERS may be unable to combine deposits of Internet transactions and non Internet credit and debit Card transactions.  Because the transactions processed via the Internet are higher risk, CUSTOMER may be charged higher fees which are set forth on the Schedule of Fees.  Internet transactions are subjected to a higher incidence of chargebacks and, as with non-Internet transactions, receiving an authorization and following procedures will not relieve the CUSTOMER of liability associated with chargebacks and/or the fraudulent use of customer data obtained off of CUSTOMER's Web Sites. All communications costs related to Internet transactions are CUSTOMER's responsibility. SERVICERS will not manage the Internet telecommunication link which is also CUSTOMER's responsibility.  Obtaining any license or sub-license of software required to permit CUSTOMER to process Internet transactions shall be CUSTOMER's responsibility, and if obtained from SERVICER's, subject to a separate agreement.  SERVICERS do not guarantee that obtaining required approvals from SERVICERS or implementing suggested security measures will cause CUSTOMER's Internet transactions to be secure or impregnable, and SERVICERS will not be responsible in the event of the infiltration of CUSTOMER's or any Internet Service Provider's security systems. CUSTOMER further acknowledges and agrees that SERVICERS are not responsible for the security of the Cardholder data or information stored on CUSTOMER's or any Internet Service Provider's computers, systems or Web Site(s) and that CUSTOMER will be solely responsible for any liability, fines, or penalties arising from  its  use, storage, or dissemination of cardholder data, except to the extent such liability, fines, or penalties result from the negligence, intentional or willful misconduct of the SERVICERS.

10. **Cardholder Refunds and Credits.**

    10.1 If a Cardholder returns goods or cancels services purchased from CUSTOMER with a Card, or CUSTOMER allows any other price adjustment after a sale has been completed and a refund or adjustment is due to the Cardholder (other than any involuntary refund required by applicable airline or other tariff or by law), CUSTOMER will not return cash to the Cardholder but will instead prepare a Credit Voucher and process each such refund or adjustment, as specified in the Operating Procedures and Association Rules.  CUSTOMER will give the Cardholder a copy of the completed Credit Voucher.

    10.2 If CUSTOMER establishes a policy limiting refunds or acceptance of returned merchandise (e.g., no refund, exchange only, in-store credit only, or special conditions), CUSTOMER must follow the procedures regarding refunds and returned merchandise as set forth in the Association Rules including, without limitation, the proper disclosure of such policy on all copies of each Sales Draft in letters at least 1/4" high in close proximity to the space provided for the Cardholder's signature.

    10.3 CUSTOMER will not accept money from a Cardholder for the purpose of preparing and depositing a Credit Voucher that will effect a deposit to the Cardholder's account.  CUSTOMER must not process a Credit Voucher without having completed a previous Card transaction with the same Cardholder (or with a Cardholder who purchased a gift returned by the recipient). Under no circumstances may CUSTOMER require a Cardholder to waive the Cardholder's right to dispute a Card transaction with the Card issuing bank.

11 **Presentment of Card Transactions.**

    11.1 CUSTOMER shall electronically or physically deliver to SERVICERS Sales Drafts for all Card transactions to be processed and settled hereunder.  The deadlines for submitting Sales Drafts are: (i) for VISA and MasterCard Card transactions, the special time frames specified in the Schedules for CUSTOMER's Card transactions to qualify for the special pricing provided under applicable VISA and MasterCard incentive programs; (ii) for Card transactions involving Cards other than VISA or MasterCard, the time frames established by CUSTOMER's agreement with the applicable Association or by the applicable Association Rules; (iii) the applicable time of day specified in the Schedules hereto and (iv) in no event later than the fifth calendar day or third banking day (whichever is earlier) after completing Card transactions (unless CUSTOMER is entitled to any special extension of these deadlines). <u>CUSTOMER acknowledges that the times specified in clause (iv) of the previous sentence are the maximum deadlines and that faster time frames are required to qualify for incentive programs.</u>

    11.2 CUSTOMER will not submit any Sales Draft that was not created in conjunction with a Card transaction between CUSTOMER and the applicable Cardholder.  Under no circumstances will CUSTOMER submit any Sales Draft that has been previously charged back by the Cardholder and subsequently returned to CUSTOMER.

12. **Settlement of Card Transactions.**

    12.1 SERVICERS will only be required to settle CUSTOMER's Card transactions for Cards as specified herein. Promptly after presentment of Sales Drafts pursuant to Section 11, above, as applicable, SERVICERS will initiate a transfer via Automated Clearing House Credit of the applicable settlement funds to CUSTOMER.   When SERVICERS receive payment of settlement funds through automated clearing house credit, SERVICERS will initiate a transfer of such applicable settlement funds through ACH to CUSTOMER's Settlement Account. Settlement by automated clearing house credit will take place the second banking day after SERVICERS process the applicable Card transactions.

    12.2 All settlements to CUSTOMER for VISA and MasterCard Card transactions will be based upon gross sales, less credits/refunds, adjustments, applicable interchange, assessments, fees, Chargebacks, amounts payable to third parties pursuant to instructions from CUSTOMER in accordance with Association Rules, and any other amounts then due from CUSTOMER to SERVICERS. Settlement generally occurs within two (2) banking days after SERVICERS process applicable settlement file.

    12.3 All credits to CUSTOMER's Settlement Account or other payments to CUSTOMER are provisional and are subject to, among other things, SERVICERS' final audit, Chargebacks (including SERVICERS' related losses), fees and fines imposed by the Associations. CUSTOMER agrees that SERVICERS may debit or credit CUSTOMER's Settlement Account

for any deficiencies, overages, fees and pending Chargebacks, or may deduct such amounts from settlement funds due to CUSTOMER. Alternatively, SERVICERS may elect to invoice CUSTOMER for any such amounts, net due 30 days after the invoice date or on such earlier date as may be specified.

12.4 SERVICERS will not be liable for any delays in receipt of funds or errors in debit and credit entries caused by third parties including but not limited to any Association or CUSTOMER's financial institution. In addition to any other remedies available to SERVICERS under this Bankcard Addendum, CUSTOMER agrees that should any of the events set forth in Paragraph 21.3 occur, SERVICERS may, upon at least 24 hours' advance written notice, change processing or payment terms to suspend credits or other payments of any and all funds, money and amounts now due or hereafter to become due to CUSTOMER from SERVICERS pursuant to the terms of this Bankcard Addendum, until SERVICERS have had reasonable opportunity to investigate and discuss such event with CUSTOMER. In cases of fraud or similar cause, no prior notice shall be required, but SERVICERS shall notify CUSTOMER in writing within three business days after effectuating a suspension of credits or other payments, which notice shall state SERVICERS' reason for the belief that such fraud or similar cause exists.

## 13 Fees; Adjustments; Collection of Amounts Due.

13.1 SERVICERS shall charge CUSTOMER a fee for the Services, which shall be calculated and payable pursuant to the Schedules and any additional pricing supplements. The discount fees shown on such Schedules shall be calculated based on the gross amount of only VISA and MasterCard transactions submitted to SERVICERS. The fees with respect to other Card transactions shall be a percentage of the gross amount of, or a per transaction fee for, all such Card transactions. SERVICERS will refund applicable interchange fees to CUSTOMER daily. CUSTOMER acknowledges that the fees stated herein are based upon the qualification of CUSTOMER's transactions for certain reduced interchange fees as set by the applicable Association. If CUSTOMER's Card transactions fail to qualify for the reduced interchange fees, SERVICERS shall process such Card transactions at the applicable interchange fees as set by the applicable Association. If a transaction fails to qualify for CUSTOMER's anticipated interchange levels, then the Association will downgrade the transaction and process it at a more costly interchange level for which it does qualify. In that event, CUSTOMER shall be charged a Non-Qualified Interchange Fee, which is the difference between the interchange fee associated with the anticipated interchange level and the interchange fee associated with the interchange level at which the transaction actually was processed ("Non-Qualified Interchange Fee").

13.2 The fees for Services set forth in the Schedules and any additional pricing supplement, are based upon assumptions associated with the anticipated annual volume, average transaction size and CUSTOMER's method of doing business. If the actual volume or transaction size falls below fifty (50%) percent of the volume or transaction size indicated on Schedule A, or if CUSTOMER significantly alters its method of doing business, SERVICERS may adjust CUSTOMER's discount fee and transaction fees without prior notice. If the actual volume or average transaction size rises by more than fifty (50%) of the volume or transaction size indicated on Schedule A, SERVICERS will adjust CUSTOMER's discount fee and transaction Fee downward.

13.3 The fees for Services set forth in the Schedules may be adjusted to reflect increases or decreases by Associations in interchange, assessment or other Association fees or to pass through increases charged by Third Parties for on-line communications. All such adjustments shall be CUSTOMER's responsibility to pay and shall become effective upon the date any such change is implemented by the applicable Association or other Third Party. CUSTOMER shall at all times be responsible for, payment of all fees and charges (including increases additions, or modification made thereto), without limitation, of any Credit Card Association, Network, card-issuing organization, telecommunications provider, federal, state, or local governmental authority (each a "Third Party") including, without limitation any switch fee, issuer, reimbursement fee, adjustment fee, interchange fee, assessment fee or access fee, (collectively, Third Party Fees").

13.4 If CUSTOMER receives settlement funds by wire transfer, SERVICERS may charge wire transfer fees of ▮▮▮▮▮▮▮▮▮ per wire, notwithstanding any lesser amount shown on the Schedules, during any month in which the average daily settlement funds wire transferred to CUSTOMER is less than ▮▮▮▮▮▮▮▮▮▮

13.5 In addition to the regular Chargeback fees, as set forth on the Schedules, CUSTOMER agrees to pay SERVICERS any fines, fees, or penalties imposed on SERVICERS by any Association, resulting from Chargebacks and any other fines, fees or penalties imposed by an Association with respect to negligent acts or omissions of CUSTOMER.

13.6 If CUSTOMER's Chargeback Percentage for any line of business exceeds the estimated industry chargeback percentage, CUSTOMER shall, in addition to the regular Chargeback fees due to SERVICERS and any applicable Chargeback handling fees or fines imposed by the applicable Association, pay SERVICERS the excessive Chargeback fee shown on the Schedules for all Chargebacks occurring in such month in such line(s) of business. Each estimated industry chargeback percentage is subject to change from time to time by SERVICERS in order to reflect changes in the industry chargeback percentage reported by VISA or MasterCard. Each then-current industry chargeback percentage for CUSTOMER's applicable line(s) of business will be reflected in the monthly loss prevention report furnished to CUSTOMER.

13.7 If CUSTOMER believes any adjustments should be made with respect to CUSTOMER's Settlement Account for any amounts due to or due from SERVICERS, CUSTOMER shall notify SERVICERS (at the addresses set forth in Section 26.2 and 27, respectively) in writing within 60 days after any debit or credit is or should have been effected. If CUSTOMER notifies SERVICERS after such time period, SERVICERS may, in their discretion, assist CUSTOMER, at CUSTOMER's expense, in investigating whether any adjustments are appropriate and whether any amounts are due to or from other parties, but SERVICERS shall not have any obligation to investigate or effect any such adjustments. Any voluntary efforts by SERVICERS to assist CUSTOMER in investigating such matters shall not create any obligation to continue such investigation or assist with any investigation in response to any future notices of possible adjustments that are not timely submitted.

14. **Chargebacks.**

14.1 CUSTOMER shall be responsible for all Chargeback amounts relating to Card transactions settled by SERVICERS where:

    (i)   merchandise is returned and a proper credit for Cardholder is not received by SERVICERS for processing;

    (ii)  the Sales Draft is, or is alleged to have been, executed, accepted, endorsed, completed or assigned improperly without authority or not in accordance with the Authorization requirements or provisions of this Bankcard Addendum;

    (iii) regardless of any Authorization obtained (including without limitation, telephone and mail order transactions), CUSTOMER completed a transaction when the Cardholder did not sign the Sales Draft;

    (iv) the signature on the draft was unauthorized as compared to the signature appearing on the Card, the signature panel on the Card was blank, or a limited purpose business purchasing card was accepted without appropriate authorization of the nature of the goods or services purchased (in addition to Authorization of the transaction amount);

    (v)  the Sales Draft is incorrectly completed, incomplete or illegible;

    (vi) the Cardholder disputes the sale, quality or delivery (or availability for pre-arranged pick-up) of merchandise or the performance or quality of service covered by the Sales Draft or agreement accepted by such Cardholder;

    (vii) the circumstances in which the Sales Draft was created or submitted by, or credit was received by, CUSTOMER constituted or otherwise involved a breach of any term, condition, representation, warranty or duty of CUSTOMER hereunder;

    (viii) multiple Sales Drafts were executed to avoid the need to obtain authorization necessary to complete the transaction;

    (ix) the extension of credit for merchandise sold or rented or services performed was in violation of law or the rules or regulations of any governmental agency, whether federal, state, local or otherwise;

    (x)  a legible copy of the Sales Draft or Credit Voucher cannot be produced by CUSTOMER within ten days of SERVICERS' request (except to the extent SERVICERS are responsible pursuant to Paragraph 16.1);

    (xi) the Cardholder asserts any claim or defense which the Cardholder has as a consumer of goods or services;

    (xii) the Cardholder disputes the validity of a telephone or mail order Card transaction;

(xiii) the Card transaction is otherwise subject to Chargeback by the Card issuing bank or Cardholder in accordance with the Association Rules or applicable law; or

(xiv) the Card transaction is subject to Chargeback in accordance with the procedures set forth in the Operating Procedures.

14.2 CUSTOMER shall reimburse SERVICERS for any Chargebacks, return items, or other losses resulting from CUSTOMER's failure to produce a Card transaction record requested by SERVICERS within the applicable time limits.

## 15. Representations; Warranties.

15.1 Without limiting any other warranties hereunder, CUSTOMER represents and warrants as to each Card transaction submitted by CUSTOMER under this Bankcard Addendum that:

(i) the Card transaction represents a bona fide sale/rental of merchandise or services not previously submitted;

(ii) the Card transaction represents an obligation of the Cardholder for the amount of the Card transaction;

(iii) the amount charged for the Card transaction is not subject to any dispute, setoff, or counterclaim;

(iv) the Card transaction amount is only for the merchandise or services (including taxes, but without any surcharge) sold or rented and, except for any delayed delivery or advance deposit Card transactions expressly authorized by this Bankcard Addendum, the merchandise or service was actually delivered to or performed for the person entering into the Card transaction simultaneously upon CUSTOMER's accepting and submitting the Card transaction for processing;

(v) the Card transaction does not represent the refinancing of an existing obligation of the Cardholder (including any obligation otherwise owed to CUSTOMER by a Cardholder or arising from the dishonor of a personal check);

(vi) CUSTOMER has no knowledge or notice of any fact, circumstances or defense which would indicate that the Card transaction was fraudulent or not authorized by the Cardholder or which would otherwise impair the validity or collectibility of the Cardholder's obligation arising from such Card transaction or relieve the Cardholder from liability with respect thereto;

(vii) the Card transaction submitted to SERVICERS was entered into by CUSTOMER and the Cardholder; and

(viii) the Card transaction was made in accordance with the terms of this Bankcard Addendum, Association Rules and the Operating Procedures.

15.2 SERVICERS represent and warrant that SERVICERS will provide the services in accordance with the applicable association rules and applicable law.

## 16. Retention of Records.

16.1 If the Schedules provide that FDMS shall prepare and retain images (on microfilm or otherwise) of CUSTOMER's paper Sales Drafts and Credit Vouchers, CUSTOMER shall deliver to FDMS the originals or copies of CUSTOMER's Sales Drafts and Credit Vouchers in suitable form for imaging no later than seven calendar days from the date of the transaction; provided however, that CUSTOMER shall retain legible copies of Sales Drafts and Credit Vouchers for at least six months following the date of each such transaction. If the Schedules provide that FDMS shall capture and store data reflecting Card transactions electronically transmitted to FDMS, CUSTOMER shall transmit to FDMS all data required to be included on Sales Drafts and Credit Vouchers (or CUSTOMER shall be responsible for any deficiencies in the data transmitted).

16.2 If the Schedules provide that CUSTOMER shall retain images (on microfilm or otherwise) or legible copies of CUSTOMER's Sales Drafts and Credit Vouchers, CUSTOMER shall retain legible copies of Sales Drafts and Credit Vouchers for a period of at least eighteen months from the date of each such transaction. CUSTOMER shall submit to SERVICERS a legible copy of a Sales Draft or Credit Voucher within 48 hours of a request by SERVICERS.

16.3 Unless the Schedules provide that FDMS is responsible for retaining records of CUSTOMER's Card transaction data and CUSTOMER has actually delivered to FDMS the applicable Card transaction data containing all required information in legible and suitable form for imaging or electronic capture and storage (as applicable), CUSTOMER shall be responsible for the retrieval of all Sales Drafts and Credit Vouchers requested by SERVICERS within the shortest time limits established by the Association Rules, as specified in the Operating Procedures, this

Bankcard Addendum, or other notice from SERVICERS. CUSTOMER shall not be relieved of its responsibility under the preceding sentence for any deficiencies in Card transaction data transmitted or otherwise delivered to SERVICERS, even though FDMS may agree to capture or produce images of, store and retrieve any such incomplete data on CUSTOMER's behalf.

17. **Cash Payments by and Cash Disbursements to Cardholders.**
CUSTOMER shall not accept any direct payments from Cardholders for charges of merchandise or services which have been included on a Sales Draft, it being the right of the Card issuing bank to receive such payments. Taxes on Card transactions must be included in the amount charged and may not be collected by CUSTOMER in cash. CUSTOMER shall not make any cash disbursements to a Cardholder as part of a Card transaction except to the extent expressly authorized by one or more of the Schedules, the Operating Procedures or the Association Rules.

18. **Confidentiality.**
18.1 Unless CUSTOMER obtains consents from each applicable Association, SERVICERS, Card issuing bank and Cardholder, CUSTOMER shall not use, disclose, sell or disseminate any Cardholder information obtained in connection with a Card transaction (including the names, addresses and Card account numbers of Cardholders) except for purposes of authorizing, completing and settling Card transactions and resolving any chargebacks, retrieval requests or similar issues involving Card transactions, other than pursuant to a court or governmental agency request, subpoena or order. CUSTOMER shall use proper controls for and shall limit access to, and shall render unreadable prior to discarding, all records containing Cardholder account numbers and Card imprints. CUSTOMER must not retain or store magnetic stripe data after a transaction has been authorized. If CUSTOMER stores any electronically captured signature of a Cardholder, CUSTOMER shall not reproduce such signature except upon specific request of SERVICERS.
18.2 CUSTOMER acknowledges that it obtains no ownership rights in any information relating to and derived from Card transactions. Cardholder account numbers, personal information and other Card transaction information, including any databases containing such information, may not be sold or disclosed to a third party as an asset upon a bankruptcy, insolvency or failure of CUSTOMER's business. Upon a bankruptcy, insolvency or failure of CUSTOMER's business all Card transactions information must be returned to SERVICERS or acceptable proof of the destruction of all Card transaction information must be provided to SERVICERS.

19. **Supplies; Advertising.**
At CUSTOMER's option and at charges specified from time to time by SERVICERS, SERVICERS may furnish CUSTOMER with operational supplies such as the forms of sales drafts, credit vouchers and Association decals (excluding any supplies for terminals or other equipment, which shall be CUSTOMER's responsibility). CUSTOMER shall display VISA, MasterCard and, if applicable, other Association decals and program marks on promotional materials furnished by SERVICERS, as required by Association Rules, but shall not indicate that VISA, MasterCard or any other Association endorses CUSTOMER's goods or services and shall not continue using such materials after termination of this Bankcard Addendum.

20. **Assignment.**
20.1 Any transfer or assignment of this Agreement by CUSTOMER without SERVICERS' prior written consent, such consent not to be unreasonably withheld, by operation of law or otherwise, is voidable by SERVICERS. Notwithstanding the foregoing, in the event that this Agreement is, indeed, assigned or transferred by CUSTOMER, CUSTOMER must notify SERVICERS, in writing, of such transfer or assignment not later than 15 days following the transfer or assignment. SERVICERS shall have 60 (sixty) days from the date they receive notice of the transfer or assignment to review same. If SERVICERS, in their sole discretion, approve such transfer or assignment, CUSTOMER shall remain liable only for obligations under this Agreement incurred up through the date of the transfer or assignment, whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured. The party to whom the Agreement was transferred or assigned shall be bound to the terms and conditions of this Agreement to the same extent as if SERVICERS and such assignee or transferee entered into an agreement identical to this Agreement on the effective date of such transfer or assignment. If SERVICERS, in their sole discretion, determine that they disapprove of any

transfer or assignment, SERVICERS may terminate this Agreement upon 15 days notice to CUSTOMER and CUSTOMER shall indemnify and hold SERVICERS harmless from all liabilities, Chargebacks, expenses, costs, fees and fines arising in connection with such transferee's or assignee's, as the case may be, submission of Card transactions to SERVICERS for processing. SERVICERS' failure to disapprove of a transfer or assignment within 90 days of their receipt of notice of such shall constitute their approval. The approval by SERVICERS of a transfer or assignment will not be unreasonably withheld. For purposes of this Agreement, any transfer of voting control of CUSTOMER or its parent shall be considered an assignment or transfer hereof; provided, however, that in the event that CUSTOMER's assets or shares are transferred or allocated among the Schnuck Family for succession purposes, estate planning purposes or otherwise, it shall not be considered an assignment under this Agreement.

20.2 Upon notice to CUSTOMER, another VISA and MasterCard member may be substituted for CPSI under whose sponsorship this Bankcard Addendum is performed. Upon substitution, such other VISA and MasterCard member shall be responsible for all obligations required of CPSI, including without limitation, as may be expressly required by applicable Association Rules. Subject to Association Rules, SERVICERS may assign or transfer this Bankcard Addendum and their rights and obligations hereunder and may delegate their duties hereunder, in whole or in part, to any third party, whether in connection with a change in sponsorship, as set forth in the preceding sentence, or otherwise, without the consent of or prior notice to CUSTOMER.

20.2 Except as provided in the following sentence, this Bankcard Addendum shall be binding upon permitted successors and assigns and shall inure to the benefit of the parties and their respective permitted successors and assigns. No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, debtor in possession, sheriff or any other officer of a court, or other person charged with taking custody of a party's assets or business, shall have any right to continue or to assume or to assign this Bankcard Addendum.

21. **Term; Events of Default.**

21.1 This Bankcard Addendum and the applicable Schedules shall become effective upon the date this Bankcard Addendum and the applicable Schedules are signed by the last party hereto.

21.2 The initial term and any subsequent terms of this Bankcard Addendum shall commence and shall continue in force as described in the MSA.

21.3 If any of the following events shall occur (each an "Event of Default"):

(i) a material adverse change in the business, financial condition, business procedures, products or services of CUSTOMER which, in Servicers reasonable discretion, increases Servicers potential exposure to CUSTOMER chargebacks or indicates that CUSTOMER may not be able to fully service its obligations under this Bankcard Addendum; or

(ii) any assignment or transfer of voting control of CUSTOMER or its parent in violation of Section 20 above; or

(iii) a sale of all or substantially all of CUSTOMER's assets; or

(iv) fraudulent Card sales by CUSTOMER, or excessive Chargebacks (in excess of 1.0% of transaction or dollar volume) which CUSTOMER fails to cure within 30 days of receipt of notice; or

(v) any representation or warranty of any Party in this Bankcard Addendum is breached in any material respect and the breaching party does not cure such breach within thirty (30) days of the non-breaching party's notification to the breaching party of such breach; or any representation or warranty of any Party in this Bankcard Addendum was or is incorrect in any material respect when made or deemed to be made; or

(vi) either Party shall default in any material respect in the performance or observance of any term, covenant, condition or agreement contained in this Bankcard Addendum, including, without limitation Data Security requirements as detailed in Section 25, and, on the part of CUSTOMER, the establishment or maintenance of funds in a Reserve Account, as detailed in Section 22,, or .

(vii) CUSTOMER shall default in any material respect in the performance or observance of any term, covenant or condition contained in any agreement with any affiliate of SERVICERS, including, but not limited to, any agreement governing check guarantee or check verification services and CUSTOMER does not cure such default within thirty (30) days of notice by SERVICERS of such default; or

(viii) CUSTOMER shall default in the payment when due, whether upon maturity or otherwise, of any material indebtedness for borrowed money in excess of ten million dollars ($10,000,000.00) and CUSTOMER does not cure such default within thirty (30) days of notice by SERVICERS of such default; or

(ix) either Party shall: commence a voluntary case under the Bankruptcy Code; file a petition seeking to take advantage of any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or entry into a composition agreement or similar arrangement for adjustment of debts; consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under such bankruptcy laws or other laws; apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign; generally become unable to pay its debts or trade obligations as they become due; make a general assignment for the benefit of creditors; or take any corporate action for the purpose of authorizing any of the foregoing; or

(x) a case or other proceeding shall be commenced against any Party, in any court of competent jurisdiction seeking relief under the Bankruptcy Code or under any other laws, domestic or foreign, relating to bankruptcy, insolvency, reorganization, winding up or adjustment of debts, the appointment of a trustee, receiver, custodian, liquidator or the like of such Party, or of all or any substantial part of the assets, domestic or foreign, of such Party, and such case or proceeding shall continue undismissed or unstayed for a period of sixty (60) consecutive days, or an order granting the relief requested in such case or proceeding against such Party (including, but not limited to, an order for relief under the Bankruptcy Code) shall be entered;

(xi) the independent certified accountants retained by CUSTOMER shall refuse to deliver an unqualified opinion with respect to the annual financial statements of CUSTOMER and its consolidated subsidiaries; or

(xii) CUSTOMER does not provide its financial statement if reasonably requested by SERVICERS pursuant to this Agreement.

then, upon the occurrence of (1) an Event of Default specified in subparagraphs (iv), (vi), (ix) or (x) above, the non-defaulting party may terminate this Bankcard Addendum immediately, without notice, and all amounts payable hereunder by CUSTOMER to SERVICERS or by SERVICERS to CUSTOMER, as the case may be, shall be immediately due and payable in full without demand or other notice of any kind, all of which are expressly waived by the Parties, (2) an Event of Default specified in subparagraph (xii), SERVICERS may terminate upon thirty (30) days notice, and (3) any other Event of Default, this Bankcard Addendum may be terminated by the non-defaulting party by giving not less than sixty (60) days notice (such 60 days to run concurrently with any cure period associated with such default) to the defaulting Party, and upon such notice all amounts payable hereunder by CUSTOMER to SERVICERS or by SERVICERS to CUSTOMER, as the case may be, shall be due and payable on demand.

21.4 Neither the expiration nor termination of this Bankcard Addendum shall terminate the obligations and rights of the parties pursuant to provisions of this Bankcard Addendum which by their terms are intended to survive or be perpetual or irrevocable and such provisions shall survive the expiration or termination of this Bankcard Addendum.

21.5 If any Event of Default shall have occurred and be continuing, SERVICERS may, in their sole discretion, exercise all of their rights and remedies under applicable law, including, without limitation, exercising their rights under Section 22.

21.6 Intentionally deleted.

21.7 This Bankcard Addendum also may be terminated by SERVICERS without notice or penalty, if in their sole discretion, such termination is necessary for SERVICERS to comply with their obligations under any applicable law, rule or regulation including, but not limited to, the Office of Foreign Assets Control ("OFAC") Regulations and Association Rules.   SERVICERS' termination of this Bankcard Addendum pursuant to this Section 21.7 shall not be deemed a breach of contract by SERVICERS.

21.8 If this Bankcard Addendum is terminated for cause, CUSTOMER acknowledges that SERVICERS may be required to report CUSTOMER's business name and the names and other identification of its principals to the Combined Terminated Merchant File maintained by

VISA and MasterCard.  CUSTOMER expressly agrees and consents to such reporting in the event CUSTOMER is terminated as a result of the occurrence of an Event of Default or for any reason specified as cause by VISA or MasterCard.  Furthermore, CUSTOMER agrees to waive and hold SERVICERS harmless from and against, any and all claims which CUSTOMER may have as a result of such reporting so long as such Event of Default has actually occurred.

21.9 The provisions governing processing and settlement of Card transactions, all related adjustments, fees and other amounts due from CUSTOMER and the resolution of any related chargebacks, disputes or other issues involving Card transactions will continue to apply even after termination of this Bankcard Addendum, until all Card transactions made prior to such termination are settled or resolved.  In addition, the provisions of Sections 13 through 18, inclusive, 20, 22, 24 and 25, and Subsections 21.7, 21.9, 26.2 and 26.3, all in this Bankcard Addendum, shall survive any termination.  Upon termination of this Bankcard Addendum, CUSTOMER agrees to immediately send SERVICERS all the data relating to Card transactions made up to the date of termination, which had not previously been sent to SERVICERS.

21.10 After termination of this Bankcard Addendum for any reason whatsoever, CUSTOMER shall continue to bear total responsibility for all Chargebacks, fees, credits and adjustments resulting from Card transactions processed pursuant to this Bankcard Addendum and all other amounts then due or which thereafter may become due to SERVICERS under this Bankcard Addendum or may be due to SERVICERS before or after such termination to either SERVICERS or any of SERVICERS' affiliates for any related equipment or related services.

21.11 In the event that CUSTOMER fails to provide financial statements as required in Section 3.1 of the MSA, such action shall constitute a "Termination Event" and SERVICERS may terminate this Bankcard Addendum immediately, without notice, and all amounts payable hereunder by CUSTOMER to SERVICERS or by SERVICERS to CUSTOMER, as the case may be, shall be immediately due and payable in full without demand or other notice of any kind, all of which are expressly waived by the Parties.

22. **Reserve Account.**

22.1 Upon (a) the occurrence of an Event of Default on the part of CUSTOMER or (b) the provision of notice of termination of this Agreement by any party hereto or (c) in the event that SERVICERS reasonably believe that an Event of Default may have occurred, CUSTOMER expressly authorizes SERVICERS to establish a Reserve Account pursuant to the terms and conditions set forth in this Section 22. The initial amount of such Reserve Account shall be determined in SERVICERS' sole discretion but will not exceed the sum of (i) three (3) months of Chargebacks, (ii) one (1) months of credits/adjustments, (iii) the value of any goods and/or services billed in advance of fulfillment, (iv) the amount of any fees or discount due SERVICERS and (v) the amount of any current and anticipated Association fees or fines. The calculation of the portion of the Reserve Account associated with current and anticipated Association fees or fines will be based upon SERVICERS' reasonable and good faith estimate of potential exposure to such fees or fines taking into account the extent of the event(s) or action(s) precipating such fees or fines and SERVICERS past experience, if any, regarding the amounts assessed by the Association or as a result of such events or actions. The calculation for the credits and Chargebacks portion of the Reserve Account will be based upon CUSTOMER processing history and the anticipated risk of loss to SERVICERS.

22.2 In the event that the establishment of a Reserve Account is required in compliance with Section 22.1 of this Bankcard Addendum, such Reserve Account will be fully funded immediately. Such Reserve Account may be funded by all or any combination of the following: (i) one or more debits to CUSTOMER's Settlement Account or any other accounts held by BANK or any of its affiliates; (ii) one or more deductions or off sets to any payments otherwise due to CUSTOMER; or (iii) CUSTOMER's delivery to SERVICERS of a letter of credit; or (iv) CUSTOMER's pledge to SERVICERS of a freely transferable and negotiable certificate of deposit. Any such certificate of deposit or letter of credit shall be issued or established by a financial institution reasonably acceptable to SERVICERS and shall be in a form reasonably satisfactory to SERVICERS. In the event that SERVICERS opt to generate a Reserve Account in either of the forms outlined in (i) or (ii) above, CUSTOMER may thereafter elect to replace such Reserve Account with either of the instruments outlined in (iii) or (iv) above and, upon receipt of such instrument(s), SERVICERS will promptly return to CUSTOMER any moneys then maintained in the Reserve Account in the form of cash. Any Reserve Account will be held by BANK for sixty (60) days after termination of this Bankcard Addendum or for up to ten (10) months in the event that CUSTOMER has failed to comply with the Data Security requirements as outlined in Section 25 of this Agreement. CUSTOMER's funds held in a Reserve Account may be held in a commingled Reserve Account for the reserve funds of BANK's customers, without involvement by an escrow agent.

22.3 If CUSTOMER's funds in the Reserve Account are not sufficient to cover the Chargebacks, adjustments, fees and other charges due from CUSTOMER, or if the funds in the Reserve Account have been released, CUSTOMER agrees to promptly pay SERVICERS such sums upon request. In the event of a failure by CUSTOMER to fund the Reserve Account, SERVICERS may fund such Reserve Account in the manner set forth in subsection 22.2, above.

22.4 In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, SERVICERS are hereby authorized by CUSTOMER at any time and from time to time, without notice or demand to CUSTOMER or to any other person (any such notice and demand being hereby expressly waived), to set off, recoup and to appropriate and to apply any and all such funds pertaining to the Card transactions contemplated in this Bankcard Addendum now or hereafter in the possession of SERVICERS against and on account of CUSTOMER's obligations to SERVICERS and their affiliates under this Bankcard Addendum, whether such obligations are liquidated, unliquidated, fixed, contingent, matured or unmatured.

23. **Indemnification.**

23.1 In addition to the indemnity obligations set forth in Section 4 of the MSA, CUSTOMER agrees to indemnify and hold harmless SERVICERS from and against all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) resulting from any breach by CUSTOMER of any warranty, covenant, provision of this Bankcard Addendum or any misrepresentation by CUSTOMER under this Bankcard Addendum, or arising solely and directly out of any gross negligence or willful misconduct of CUSTOMER, its employees, or agents in connection with CUSTOMER's Card transactions or otherwise arising from CUSTOMER's provision of goods and services to Cardholders.

23.2 In addition to the indemnity obligations set forth in Section 4 of the MSA, SERVICERS agree to indemnify and hold harmless CUSTOMER from and against all losses, liabilities, damages and expenses (including attorneys' fees and collection costs) resulting from any breach by SERVICERS of any warranty, covenant or provision of this Bankcard Addendum or any misrepresentation by SERVICERS under this Bankcard Addendum, or arising solely and directly out of any gross negligence or willful misconduct of SERVICERS, its employees, or agents in connection with SERVICERS processing of Card transactions or any services provided pursuant to this Bankcard Addendum.

24. **Liquidated Damages.**

24.1 The parties further agree and acknowledge that, in addition to any remedies contained herein or otherwise available under applicable law and, notwithstanding anything to the contrary elsewhere in this Bankcard Addendum, if (a) CUSTOMER breaches this Bankcard Addendum by improperly terminating it prior to the expiration of the applicable term of the Bankcard Addendum, or (b) this Bankcard Addendum is terminated prior to the expiration of the applicable term of the Bankcard Addendum in accordance with, and due to, an Event of Default by CUSTOMER specified in subsection 21.3, then SERVICERS will suffer a substantial injury that is difficult or impossible to accurately estimate. Accordingly, in an effort to liquidate in advance the sum that should represent the damages which would actually be sustained by SERVICERS as the result of such a termination, the parties have agreed that the amount calculated in the manner specified below is a reasonable pre-estimate of SERVICERS' probable loss, which shall be paid to SERVICERS as liquidated damages in the event of any such termination. Any recovery pursuant to this Section 24 shall in no way limit SERVICERS' right to receive any payments due from CUSTOMER pursuant to Section 14. Such liquidated damages shall be paid to SERVICERS within 30 days after CUSTOMER's receipt of SERVICERS' calculation of the amount due. The liquidated damages amount shall equal 80% of the product of (i) the average net monthly fees, as determined in accordance with subsection 24.2, and (ii) the number of months, including any pro rata portion of a month, then remaining in the initial term or any renewal term, as applicable.

24.2 The average net monthly fees shall equal one-twelfth of the gross fees payable pursuant to the Schedules, less applicable interchange fees and assessments due pursuant to this Bankcard Addendum, during the 12 months immediately preceding the date on which (i) SERVICERS receive notice from CUSTOMER of its intention to terminate this Bankcard Addendum early, or (ii) SERVICERS learn of CUSTOMER's early termination in violation of this Bankcard Addendum, or (iii) this Bankcard Addendum is terminated early pursuant to subsection 21.3 (whichever produces the higher amount); provided, however, if the Bankcard Addendum has been in place less than 12 months, the estimated average net monthly fees shall equal the aggregate gross fees paid hereunder by CUSTOMER, divided by the number of months the Bankcard Addendum was effective.

24.3 Liquidated Damages as defined herein shall not apply to any Automatic Renewal Period.

25. **Data Security.**

Per the terms of this Bankcard Addendum, CUSTOMER is required to follow the Operating Procedures and comply with Association Rules as they may each be amended from time to time. The Association may impose different compliance requirements on different types and levels of customers. The Association may impose restrictions, fines, or prohibit CUSTOMER from participating in Association programs if it is determined CUSTOMER is non-compliant with such programs. CUSTOMER understands that it must be in compliance with data security regulations for its type or level of customer as defined by the Associations security procedures as well as comply with general security procedures. SERVICERS will endeavor to provide

CUSTOMER with amended operating procedures outlining the various Association requirements with regard to Data Security, and other matters, pursuant to the terms of the Bankcard Addendum, however, CUSTOMER understands and acknowledges that it is solely the responsibility of CUSTOMER to maintain compliance with all Association PCI Data Security procedures and regulations, and to pay any and all fines levied by the applicable Association for its non-compliance, whether or not SERVICERS provide to CUSTOMER the amended operating procedures.

CUSTOMER also understands and acknowledges that it is solely responsible for the compliance of any and all third parties (including but not limited to Internet Service Providers) that are given access by CUSTOMER, to CUSTOMER's cardholder data, and for any third party POS VAR software that CUSTOMER may use. CUSTOMER further acknowledges that it is CUSTOMER's responsibility to inform SERVICERS of any of CUSTOMER'S third party providers that are given access by CUSTOMER to CUSTOMER's cardholder data. CUSTOMER also acknowledges that it is CUSTOMER's duty to notify SERVICERS of any data security compromise and to cooperate and assist SERVICERS in any subsequent investigation.

In the event of any data security compromise, SERVICERS may in their sole discretion, suspend or terminate card processing services under the Bankcard Addendum.

SERVICERS will comply with the applicable Association Rules, which includes PCI Standards.

To the extent that SERVICERS receive, maintain, process, create, store, or otherwise have access to any Personal Information in connection with its performance of this Bankcard Addendum, in addition to and without limiting any other confidentiality obligations set forth herein, SERVICERS: (a) shall comply with all applicable Privacy Laws; and (b) shall access, use, and disclose the Cardholder Data and Personal Information only for the limited purpose of its performance of this Bankcard Addendum..

In connection with any Cardholder Data and Personal Information received, maintained, processed, created, stored, or otherwise accessed by SERVICERS, SERVICERS shall implement and maintain (and update as necessary), an information security program with appropriate administrative, technical, and physical safeguards, including without limitation, data back-up, data integrity, record retention, and incident response policies and procedures, continuity and disaster recovery plans, procedures, capabilities and facilities that are tailored to and appropriate for the nature and complexity of the Services to be provided by SERVICERS hereunder, and otherwise designed to (i) ensure the security and confidentiality of the Services, the Cardholder Data and Personal Information and ; (ii) protect against any anticipated threats or hazards to the security or integrity of the Cardholder Data and Personal Information ; and (iii) protect against unauthorized access to or use of the Personal Information, that could result in substantial harm or inconvenience to CUSTOMER, or its customers.

**Security Incident Notification**.

SERVICERS will evaluate security-related events in accordance with its incident response processes and procedures to determine whether a Security Incident has occurred, including:

(a)  Assessing the nature and scope of the security-related events; and

(b)  Promptly conducting an investigation to (i) determine whether unauthorized access to the PROVIDER System or any CUSTOMER's Cardholder Data and Personal Information has occurred and, if so, identify which systems and types of Information have been accessed, and (ii) determine the likelihood that either (A) the information has been or will be misused, or (B) the unauthorized access could result in substantial harm or inconvenience to a Cardholder of CUSTOMER.

If SERVICERS determines that a Security Incident has occurred, SERVICERS will promptly: (a) notify CUSTOMER of the material details of the Security Incident that are known at the time of notification, subject to a request by law enforcement or other government agency to withhold such notice; and (b) take steps to contain and control the Security Incident to prevent further unauthorized access to or misuse of the information and will continue to provide information

relating to the investigation and resolution of the Security Incident until SERVICERS determines that the Security Incident has been resolved.

26. **Miscellaneous.**

26.1 If CUSTOMER requests FDMS to perform or provide any system enhancements, custom reports, or related service enhancements that are different from or in addition to the system, services and reports FDMS otherwise agree to provide to CUSTOMER (collectively, "System Enhancements"), FDMS will use reasonable efforts to provide such System Enhancements if CUSTOMER pays FDMS the additional fees charged by FDMS for such System Enhancements. Following receipt of any request for System Enhancements and prior to providing the requested System Enhancements, FDMS shall provide CUSTOMER with a description of the System Enhancements to be made, together with an estimate of FDMS's fee for providing such System Enhancements. If CUSTOMER thereafter instructs FDMS to make such System Enhancements, FDMS shall do so, and CUSTOMER shall pay the additional fees charged by FDMS for such System Enhancements. Any System Enhancement provided hereunder shall be solely the property of FDMS and shall not be deemed works for hire; provided, however, FDMS hereby grants to CUSTOMER a perpetual, fully paid-up, world-wide, royalty-free license to the System Enhancement

26.2 The notice address for FDMS shall be: 1307 Walt Whitman Road, Melville, New York 11747, Facsimile (631) 683-7516, Attention: Executive Vice President Operations, with a copy to Attention: General Counsel's Office at 3975 NW 120th Avenue, Coral Springs, Florida 33065, Facsimile: (954)845-5550, and if to CPSI at Four Parkway North, 4th Floor, Deerfield IL, 60015, Attention: President, with a copy to General Counsel, 1 Court Square, Long Island City, NY 11120.

26.3 This Bankcard Addendum, along with the Master Services Bankcard Addendum any Schedules and the Operating Procedures, constitutes the entire agreement between the parties with respect to the subject matter.

26.4 The parties acknowledge that the VISA and MasterCard Association Rules give VISA and MasterCard certain rights to require termination or modification of this Bankcard Addendum with respect to transactions involving VISA and MasterCard Cards and the VISA and MasterCard Card system and to investigate CUSTOMER. The parties also acknowledge that issuers of other Cards, for which SERVICERS perform services on behalf of CUSTOMER, may have similar rights under their applicable Association Rules with respect to this Bankcard Addendum's applicability to transactions involving such other Cards.

26.5 CUSTOMER acknowledges and agrees that any of information obtained by SERVICERS may be shared with SERVICERS' affiliates, who have a need-to-know, in connection with the provision of other services provided to you by SERVICERS, as long as the affiliates are under obligation to treat such information with the same degree of care as required of SERVICERS.

27. **Transition Assistance**

Unless CUSTOMER requests otherwise, in the event of termination of this Agreement by either Party, SERVICERS shall provide the following Transition Assistance (defined below) for a period of up to one-hundred eighty (180) days following the date of termination ("Transition Period"). SERVICERS will perform the terminated or expired Services in accordance with the terms of this Agreement, including the Service Levels set forth in Attachment V attached hereto, and provide to CUSTOMER any and all assistance reasonably requested by CUSTOMER to facilitate the orderly transfer of responsibility for the terminated or expired Services to one or more successor service providers (collectively, the "Transition Assistance"). SERVICERS acknowledge that the continuity of the Services is critical to CUSTOMER and SERVICERS agree to comply with the other obligations set forth in this Section regardless of whether the Agreement was terminated by CUSTOMER or SERVICERS; provided, however, if this Agreement is terminated by SERVICERS as a result of CUSTOMER's uncured Event of Default, then the Transition Period shall be reduced from one-hundred eighty (180) days to one-hundred twenty (120) days. Notwithstanding the foregoing, SERVICERS shall have no obligation to provide the Transition Assistance if (a) an Event of Default has transpired and such default is related to CUSTOMER's material data security compromise and an Association prohibits SERVICERS from providing services to the CUSTOMER, or (b) there has been a violation of applicable law and, as a result, a regulatory or governmental agency prohibits SERVICERS from providing services to the CUSTOMER, or (c) CUSTOMER fails to fund any reserve account as required in Section 22 of this Agreement.

28. **Visa and MasterCard Disclosure**
    Member Bank Information: Citicorp Payment Services, Inc.

    The Bank's mailing address is Four Parkway North, 4th Floor, Deerfield IL, 60015
    and its phone number is 847-597-3000.

Important Member Bank Responsibilities

(a) The Bank is the only entity approved to extend acceptance of Visa and MasterCard products directly to a Merchant.

(b) The Bank must be a principal (signer) to the Merchant Bankcard Addendum.

(c) The Bank is responsible for educating Merchants on pertinent Visa and MasterCard Rules with which Merchants must comply; but this information may be provided to you by FDMS.

(d) The Bank is responsible for and must provide settlement funds to the Merchant in accordance with the terms of the Bankcard Addendum.

(e) The Bank is responsible for all funds held in reserve that are derived from settlement.

Important Merchant Responsibilities

(a) Ensure compliance with Cardholder data security and storage requirements.

(b) Maintain fraud and chargebacks below Association thresholds.

(c) Review and understand the terms of the Bankcard Addendum.

(d) Comply with Bankcard Association rules.

The parties hereto have caused this Bankcard Addendum to be executed by their duly authorized officers.

**THIS BANKCARD ADDENDUM IS NOT BINDING UPON SERVICERS UNTIL SIGNED BY SERVICERS.**

SCHNUCK MARKETS, INC.
("CUSTOMER")

By: _(signature)_

Name: _Scott C. Schnuck_
      (Please Print or Type)

Title: _Chairman and C.E.O._

Date: _October 6, 2011_

CITICORP PAYMENT SERVICES, INC.
("BANK")

By: First Data Merchant Services Corporation pursuant to limited Power of Attorney

Name: _PAUL CWALINA_
      (Please Print or Type)

Title: _SVP_

Date: _10-10-11_

FIRST DATA MERCHANT SERVICES CORPORATION
("FDMS")

By: _(signature)_

Name: _PAUL CWALINA_
      (Please Print or Type)

Title: _SVP_

Date: _10-10-11_

ANNEX 1

The following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

1.1 "Association" means any entity formed to administer and promote Cards, including VISA International and MasterCard International Incorporated, and any applicable debit networks.

1.2 "Association Rules" mean the rules, regulations, releases, interpretations and other requirements (whether contractual or otherwise) imposed or adopted by any Association.

1.3 "Authorization" means the process by which CUSTOMER electronically accesses SERVICERS' computerized system, unless such system is inoperable or otherwise not accessible to CUSTOMER, in which case CUSTOMER shall utilize the designated toll-free telephone number, to obtain credit approval from the Card issuing bank before completion of the Card transaction.

1.4 "Bankruptcy Code" means title 11 of the United States Code, as amended from time to time.

1.5 "Business Day" means a day (other than Saturday or Sunday) on which SERVICERS are generally open for business.

1.6 "Card" means a valid credit card or valid off-line debit card bearing the service mark of VISA or MasterCard and, to the extent the Schedules so provide, a valid card issued by any other Associations specified on such Schedules.

1.7 "Cardholder" means the individual whose name is embossed on the Card and any authorized user of such Card.

1.8 "Cardholder Data" has the meaning provided for in the PCI DSS, and includes primary account number, cardholder name, service code, and expiration date.

1.9 "Chargeback" means the procedure by which a Sales Draft or other indicia of a Card transaction (or disputed portion thereof) is returned to SERVICERS by the Card issuing bank. CUSTOMER must comply with the Association Rules, and is liable for all Chargebacks and related costs arising from CUSTOMER's transactions.

1.10 "Chargeback Percentage" means the ratio of overall Chargeback-to-settlement volume.

1.11 "Credit Voucher" means the evidence of a refund or price adjustment by CUSTOMER to a Cardholder's Card account in connection with a prior purchase by such Cardholder using a Card, regardless of whether the form of such evidence is in paper, electronic or otherwise.

1.12 "CUSTOMER's Chargeback Percentage" means the actual monthly percentage calculated by dividing CUSTOMER's total monthly VISA and MasterCard Chargeback items in any line of business by the number of CUSTOMER's total monthly VISA and MasterCard transactions in such line of business.

1.13 "Operating Procedures" means the then-current manual prepared by SERVICERS, containing operational procedures, instructions and other directives relating to Card transactions.

1.14 "Personal Information" means any personally identifiable information relating to Cardholder Data under this Bankcard Addendum.

1.15 "Preauthorized Order" means a Cardholder's written authorization to make one or more future charges to such Cardholder's MasterCard Card account.

1.16 "Privacy Laws" include any applicable federal or state laws, rules or regulations relating to the privacy, confidentiality, handling, storage, data export, disposal, and/or safeguarding of customer, employee, financial, or other personal information, records, or data, including without limitation, (i) the Gramm-Leach-Bliley Act (15 U.S.C. § 6801 et seq.), (ii) the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.), (iii) the Fair and Accurate Credit Transactions Act of 2003; and (iv) all federal and state data security breach notification and incident response laws and regulations.

1.17 "Recurring Sale" means a Cardholder's written authorization to make one or more future charges to such Cardholder's Visa or other non-MasterCard Card account.

1.18 "Reserve Account" means a fund established and managed by SERVICERS to protect against actual or contingent liability arising from Chargebacks, adjustments, fees and other charges due to or incurred by SERVICERS.

1.19 "Sales Draft" means evidence of a purchase of goods or services by a Cardholder from CUSTOMER using a Card, regardless of whether the form of such evidence is in paper, electronic or otherwise, all of which must conform to Association Rules.

1.20 "Schedules" means the attachments, addenda and other documents, including revisions thereto, which may be incorporated into and made part of this Bankcard Addendum.

1.21 "Schnuck Family" means (i) any lineal descendant of Donald Schnuck or Edward Schnuck (who are the father and uncle, respectively, of the current five members of the Board of Directors of the Borrower), (ii) the spouse or former spouse of Donald Schnuck, Edward Schnuck or any of their lineal descendants, (iii) any child of any spouse of a lineal descendant of Donald Schnuck or Edward Schnuck and (iv) any trust, the beneficiaries of which are any one or more of the individuals described in the preceding clause, (i), (ii), (iii) or (iv). For purposes of this definition, an adopted child shall be considered a lineal descendant.

1.22 "Security Incident" means an incident confirmed by SERVICERS or a forensic auditor selected by SERVICERS, in which Cardholder Data is accessed or used without authorization as a result of a compromise of platforms and/or systems utilized by PROVIDER to process CUSTOMER's transactions, including without limitation, authorization, settlement and chargeback platforms and/or systems.

1.23 "Services" means the activities undertaken by SERVICERS to authorize, process and settle all United States Dollar denominated VISA and MasterCard Card transactions undertaken by Cardholders at CUSTOMER's location(s) in the United States, and all other activities necessary for SERVICERS to perform the functions specified on the Schedules for all other Cards covered by this Bankcard Addendum.

1.24 "Settlement Account" means an account at a financial institution designated by CUSTOMER as the account to be debited and credited by SERVICERS for Card transactions, fees, Chargebacks and other amounts due hereunder or in connection herewith (i.e., fines, penalties, attorneys' fees, etc.).

**Schedule A**
**Fee Schedule**


REDACTED

ATTACHMENT I





Citi Merchant Services
Provided by First Data Merchant Services Corporation

**Visa / MasterCard Interchange Rates for Supermarkets (Includes Fuel)**
**Interchange rates consist of straight pass through fees, dues and assessments**

**Effective April 15, 2011**





Citi Merchant Services
Provided by First Data Merchant Services Corporation



REDACTED

Page 2 of 4



Citi Merchant Services
Provided by First Data ····chant Services Corporation



REDACTED





REDACTED

**Attachment II to Schedule A**
**Other Card Services**

This Attachment II to Schedule A supplements the Merchant Bankcard Addendum (the "Bankcard Addendum") to which it is attached and sets forth the terms applicable to FDMS provision of the specified services for the Card transactions issued by the entities set forth below:

| American Express | _____ x _____ | JCB | _____ | SVS Gift Card | _____ x _____ |
| Diners Club | _____ | Discover x | BlackHawk | _____ x _____ |

The Card issuing entities selected above are collectively referred to as ("Issuer") unless otherwise specified in this Attachment II.

**1. FEES:**



**2. GENERAL:** Customer understands and acknowledges that FDMS' sole responsibility with respect to ISSUER Card transactions shall be to provide the services specified in this Attachment.

In the event Customer has a separate Issuer Agreement with a respective Issuer, all Chargeback and financial obligations including but not limited to fees and issues related thereto shall be governed by the terms of such Issuer Agreement. Notwithstanding the foregoing, in the event FDMS is providing settlement services for Diners Club and/or JCB transactions FDMS shall be responsible for providing such services pursuant to the terms of the Bankcard Addendum. Customer shall comply with all terms and conditions of the Issuer Agreement and the applicable rules, regulations, interpretations and other requirements of the respective Issuer and shall not seek authorization for or submit for processing or settlement hereunder any Issuer Card transactions at anytime when Customer does not have in effect a valid Issuer Agreement with such Issuer. Customer agrees to notify FDMS immediately upon the termination of any Issuer Agreement to which it is a party. Upon such termination, FDMS shall have no further obligations hereunder to provide any services to Customer with respect to any transactions involving such Issuer Cards.

In the event Customer does not have a separate Issuer Agreement with a respective Issuer, the Issuer Card services to be provided hereunder shall be in accordance with the terms of the Bankcard Addendum and this Attachment.

### 3. ISSUER CONSENTS:

Customer shall be responsible for obtaining any operational consents required of Issuer to comply with procedures or practices contemplated by both Customer and FDMS under this Bankcard Addendum.

### 4. AUTHORIZATION SERVICES ONLY:

In the event FDMS is providing authorization services only for Issuer Card transactions as specified herein, Customer shall seek such authorization through FDMS. In the event that FDMS is not providing processing services for Issuer Card transactions as specified in this Attachment, Customer shall be responsible for processing and submitting directly to the applicable Issuer for settlement of such Card transactions.

### 5. PROCESSING AND SUBMISSION TO ISSUERS:

In the event FDMS is providing processing services for Issuer Card transactions as specified herein, Customer shall submit to FDMS for processing all of Customer's Issuer Card transactions and FDMS shall process such transactions and transmit them electronically to the applicable Issuer with a summary of such Card transactions.

FDMS does not warrant or bear responsibility for the performance of any Issuer in any way.

| First Data Merchant Services Corporation | Schnuck Markets, Inc. (CUSTOMER) |
|---|---|
| By: _Paul Cwalina_ | By: _Scott C Schnuck_ |
| Name: _PAUL CWALINA_ | Name: _Scott C. Schnuck_ |
| Title: _SVP_ | Title: _Chairman and C.E.O._ |
| Date: _10-10-11_ | Date: _October 6, 2011_ |

**Attachment III**
**FIRST DATA MERCHANT SERVICES CORPORATION**
**DEBIT TRANSACTION ADDENDUM**

Customer understands and agrees that First Data Merchant Services Corporation ("FDMS") is the service provider for processing Customer's debit card transactions ("Debit Services"), pursuant to the terms herein. FDMS will designate a bank that is a member of the debit network ("Debit Network Bank").

1. Until and unless otherwise authorized by FDMS, Customer agrees to utilize FDMS compatible terminals/PIN pads or systems capable of processing all on-line debit card transactions, and to place them at its merchant locations. FDMS hereby acknowledges and agrees that the terminals/PIN pads Customer has installed at its locations as of the Effective date are FDMS compatible. As between FDMS and Customer, all software residing on these terminals or systems is the sole property of FDMS. Any software residing in Customer-owned terminals or systems must be FDMS compatible. FDMS hereby acknowledges and agrees that the software currently residing in Customer-owned terminals or systems as of the Effective Date are FDMS compatible. Customer's placement of the terminals or system at its merchant locations shall constitute acceptance of all terms and conditions set forth in this Addendum. Customer understands and agrees that neither FDMS nor BANK bear any responsibility whatsoever for Customer's-owned inoperative terminals or systems (or software if applicable). In the case of an inoperative terminal or system Customer shall consult Customer's warranty, or terminal maintenance addendum, as applicable.

2. Customer agrees to submit all debit card transactions and to abide by all applicable rules and regulations of the applicable Pin Debit card network(s) selected by Customer on the attached Application. Customer agrees to hold FDMS and Debit Network Bank harmless from any and all claims, actions, proceedings and other liability which may arise pertaining to such debit transactions. In no event shall FDMS or Debit Network Bank be liable for special, consequential or exemplary damages, including lost profits, revenues and business opportunities.

3. Customers understands that it is granted a non-exclusive, non-transferable, limited sublicense to use the service mark(s) of those POS networks that Customer participates in accordance with the rules of the applicable debit networks (each a "Protected Mark"). Customer shall have no power, right or authority to transfer, assign or license any rights in or to the use of any Protected Mark, Customer will not at any time do or cause to be done any act or deed in any way impairing or intended to impair a POS network's exclusive right, title and interest in and to its Protected Mark. Customer shall permit FDMS or Debit Network Bank at all reasonable times, to inspect the Customer's use of the Protected Mark, and shall, upon request, provide samples of Customer's use of the Protected Mark in advertising or otherwise for review.

4. Customer understands and agrees that the Debit Services are being provided by FDMS and not Debit Network Bank, and therefore Debit Network Bank shall have no liability whatsoever regarding the Services provided by FDMS.

5. Upon notice to Customer, another debit network member may be substituted for Debit Network Bank under whose sponsorship this Agreement is performed. Upon substitution, such other debit network member shall be responsible for all obligations required of Debit Network Bank, including without limitation, as may be expressly required by applicable debit network rules. Subject to debit network rules, FDMS and Debit Network Bank may assign or transfer this Agreement and their rights and obligations hereunder and may delegate their duties hereunder, in whole or in part, to any third party, whether in connection with a change in sponsorship, as set forth in the preceding sentence, or otherwise, without the notice to or consent of Customer.

Except as provided in the following sentence, this Agreement shall be binding upon permitted successors and assigns and shall inure to the benefit of the parties and their respective permitted successors and assigns. No assignee for the benefit of creditors, custodian, receiver, trustee in bankruptcy, debtor in possession, sheriff or any other officer of a court, or other person charged with taking custody of a party's assets or business, shall have any right to continue or to assume or to assign this Agreement.

6. Customer further understands that any claims it may have regarding the Debit Services may not be offset against non PIN Debit sales.

7. Customer assumes all responsibility for paper copy of debit card transactions, pursuant to the appropriate debit card network rules.

8. Within one (1) business day of the original transaction, Customer must balance each location to the FDMS system for each business day that each location is open. If Customer determines that transaction(s) have been processed in error, Customer will initiate the appropriate transaction for adjustment to correct the transaction in question. Customer is responsible for all applicable adjustment fees per appropriate debit card network.

9. Customer shall be responsible for all telephone message unit costs, if any, as they are incurred by Customer for any of the services provided.

10. The responsibility for the installation of and training in the use of terminals shall be dependent upon the type of equipment or system being utilized by Customer.

11. FDMS shall settle debit card transaction proceeds to Customer daily, via a deposit to Customer's Settlement Account. All such settlements to Customer will not be net of adjustments, network fees or Servicers' fees. Servicers shall invoice Customer monthly for all such fees and debit Customer's Settlement Account monthly in the amount of such invoice. Notwithstanding the foregoing, FDMS reserves the right to change the process at any time during the term of this Agreement with 30 days prior notice to Customer, to settle debit transactions daily based on gross sales, net of applicable interchange, network switch fees, and adjustments fees.

12. The fees for the PIN Debit network used to process your transaction will be applied. Which PIN Debit Network will be used will depend upon the availability of the network at the time of the transaction, whether a particular PIN Debit Card is enabled for a particular network, the routing requirements established by the networks and the card issuers, or other factors. You agree that we may, at our sole discretion, utilize any PIN Debit Network available to us for a given transaction.

13. Customer shall be responsible for the following debit related fees:

<!-- redacted -->

**General Pricing Information:**

1. Billable transactions include: purchases, returns, declines, reversals, and authorizations.

2. The PIN Debit Network transactions include authorization, settlement and sponsorship.

3. The fees and charges set forth on this Schedule are in addition to all other third party fees and all fees due and payable to Servicers and/or any applicable third party, will be collected by Servicers as set forth in the Agreement. In addition, Customer will also be charged the network fees on a per transaction per network basis, pursuant to Section 11, above.

CUSTOMER AGREES THAT THE ABOVE-REFERENCED NETWORK FEES ARE CONTROLLED BY SAID NETWORK(S) AND ARE SUBJECT TO CHANGE BY THE NETWORK(S) AND THEREFORE TO THE CUSTOMER AT ANY TIME. SERVICERS WILL USE COMMERCIALLY REASONABLE EFFORTS TO NOTIFY CUSTOMER PRIOR TO ANY EFFECTIVE CHANGE.

NOTWITHSTANDING THE ABOVE, CUSTOMER WILL BE GIVEN WRITTEN NOTICE THIRTY DAYS BY SERVICERS PRIOR TO OTHER CHANGES IN FEES. CUSTOMER AGREES TO COMPLY WITH ALL APPLICABLE FEDERAL, STATE AND LOCAL LAWS APPLICABLE TO DEBIT TRANSACTIONS. CUSTOMER ACKNOWLEDGES THAT DEBIT TRANSACTIONS ARE GOVERNED BY NETWORK REGULATIONS AS WELL AS FEDERAL AND STATE LAW, INCLUDING THE ELECTRONIC FUNDS TRANSFER ACT (KNOWN AS REGULATION E) AND AGREES TO BE COMPLIANT WITH SUCH REGULATIONS.

SCHNUCK MARKETS, INC.
(CUSTOMER)

By: _____

Name: _Scott C. Schnuck_____

Title: _Chairman and C.E.O.___

Date: _October 6, 2011_____

FIRST DATA MERCHANT SERVICES CORPORATION

By: _____

Name: _PAUL CWALINA_____

Title: _SVP_____

Date: _10-10-11_____

**Attachment IV**
**FIRST DATA MERCHANT SERVICES CORPORATION**
**ELECTRONIC BENEFITS TRANSFER TRANSACTION ADDENDUM**

This Addendum (this "Addendum") to that certain Bankcard Processing Agreement for EBT Services is made and entered into as of this _____ day of _____, 2011 between First Data Merchant Services Corporation and Customer as identified below.

CUSTOMER understands and agrees that that First Data Merchant Services Corporation ("FDMS") is the service provider for processing Customer's EBT card transactions ('EBT Services"), pursuant to the terms herein.

CUSTOMER agrees to issue Cash Benefits and will provide cash back or cash only transactions. CUSTOMER agree to maintain adequate cash on hand to issue confirmed Cash Benefits and will issue Cash Benefits to EBT customers in the same manner and to the same extent cash is provided to your other customers. CUSTOMER may not require that any EBT customers purchase goods or services as a condition to receiving Cash Benefits, unless such condition applies to other customers as well. CUSTOMER may not designate special checkout lanes restricted to use by EBT customers unless CUSTOMER also designates special checkout lanes for debit or Credit Cards and/or other payment methods.

1.1. **Issuance of Benefits.** CUSTOMER agree to issue benefits to EBT customers in accordance with the procedures specified in all documentation provided to CUSTOMER by FDMS, as amended from time-to-time and pursuant to applicable law. CUSTOMER must provide each EBT customer a receipt for each EBT transaction.

CUSTOMER will issue EBT benefits to EBT customers, in accordance with our then current procedures, in the amount authorized through a point-of-sale terminal, with personal identification number pad and printer. In the event of an equipment failure, CUSTOMER must comply with applicable procedures regarding Authorization.

CUSTOMER must also comply with the procedures set forth in the Quest Operating Rules, as amended from time-to-time, issued by the National Automated Clearing House Association and approved by the Financial Management Service of the U.S. Treasury Department, and any additional procedures specified by any additional state or federal government or agency regarding lost EBT Cards, forgotten PINs, discrepancies in benefits authorized and similar matters by providing EBT customers with information such as telephone numbers and addresses of the appropriate state agencies.

CUSTOMER may not accept any EBT Card for any purpose other than the issuance of benefits, including without limitation acceptance of any EBT Card as security for repayment of any customer obligation. In the event of any violation of this provision, CUSTOMER will be obligated to reimburse the applicable state or FDMS for any benefits unlawfully received.

1.2. **Issuance Records.** CUSTOMER must retain all EBT-related records (including but not limited to manual Sales Drafts) for three (3) years following benefit issuance, or for such additional period as may be required by law.

CUSTOMER must make all EBT-related records available for audit upon request to representatives of any applicable state or its EBT service provider, or other authorized state or federal government agency during normal business hours.

To assure compliance with this Section 1.2, a state, its EBT service provider, or another authorized state or federal government agency, will at all times, upon advance notice, except in the case of suspected fraud or other similar activity, have the right to enter, during normal business hours, your premises to inspect or evaluate any work performed under this Agreement, or to obtain any other information required to be provided by CUSTOMER or otherwise related to your EBT transactions.

1.3. **Required Licenses.** If CUSTOMER issues benefits under this Agreement, CUSTOMER represents and warrants to FDMS that CUSTOMER is properly authorized to enter such transactions and is not currently disqualified or withdrawn from redeeming food stamp coupons or otherwise disqualified or withdrawn by any applicable agency. CUSTOMER agrees to secure and maintain at your own expense all necessary licenses, permits, franchises, or other authorities required to lawfully effect the issuance and distribution of benefits under this Agreement, including without

limitation, any applicable franchise tax certificate and non-governmental contractor's certificate, and covenants that CUSTOMER will not issue benefits at any time during which CUSTOMER is not in compliance with the requirements of any applicable law.

1.4. **Term and Termination.** If CUSTOMER is disqualified or withdrawn from the food stamp program, your authority to issue benefits will be terminated contemporaneously therewith. Such disqualification or withdrawal will be deemed a breach of this Agreement with respect to your authority to issue Cash Benefits and, in the event of such disqualification, we shall have the right to immediately terminate the provision of service under this Section 1.4 or this Addendum in its entirety.

With respect to the issuance of Cash Benefits only, your authority to issue Cash Benefits may be suspended or terminated immediately at the sole discretion of FDMS, the state or its EBT service provider, effective upon delivery of a notice of suspension or termination specifying the reasons for such suspension or termination if there shall be (i) any suspension, injunction, cessation, or termination of the EBT service provider's authority to provide EBT services to the state; (ii) failure by CUSTOMER, upon not less than thirty (30) days prior written notice, to cure any breach by CUSTOMER of the provisions of these terms and conditions, including without limitation, your failure to support the issuance of benefits during your normal business hours consistent with your normal business practices, your failure to comply with issuance procedures, impermissible acceptance of an EBT Card, or your disqualification or withdrawal from the food stamp program; or (iii) based on a state's or its EBT service provider's investigation of the relevant facts, evidence that CUSTOMER or any of your agents or employees are committing, participating in, or have knowledge of fraud or theft in connection with the dispensing of benefits. In the event CUSTOMER fails to cure any breach as set forth above, CUSTOMER may appeal such suspension of termination to the applicable state for determination in its sole discretion.

In the event that your authority to issue benefits is suspended or terminated by a state or its EBT service provider, and CUSTOMER successfully appeals such suspension or termination to the state or its EBT service provider, we shall be under no obligation to reinstate the services previously provided.

The provision of services under this Section 1.4 shall terminate automatically in the event that our Agreement or our service provider's agreement with any applicable state's EBT service provider terminates for any reason.

1.5. **Confidentiality of EBT System Information.** All information related to EBT recipients and/or the issuance of benefits shall be considered confidential information.

Individually identifiable information relating to a benefit recipient or applicant for benefits will be held confidential and will not be disclosed by CUSTOMER or your directors, officers, employees or agents, without prior written approval of the applicable state.

The use of information obtained by CUSTOMER in the performance of your duties under this Section 1.5 will be limited to purposes directly connected with such duties.

1.6. **EBT Service Marks.** CUSTOMER will adequately display any applicable state's service marks or other licensed marks, including the Quest mark, and other materials supplied by FDMS, collectively the "Protected Marks," in accordance with the standards set by the applicable state. CUSTOMER will use the Protected Marks only to indicate that benefits are issued at your location(s) and will not indicate that we, any state or its EBT service provider endorses your goods or services. Your right to use such Protected Marks pursuant to this Agreement will continue only so long as this Agreement remains in effect or until CUSTOMER are notified by FDMS, any state or its EBT service provider to cease their use or display.

1.7 **EBT Fees.** 

**General Pricing Information:**

1.  Billable transactions include: purchases, returns, declines, reversals, and authorizations.

2.  The EBT network transactions include authorization, sponsorship and settlement.

3. The fees and charges set forth on this Schedule are in addition to all other third party fees and all fees due and payable to Servicers and/or any applicable third party, will be collected by Servicers as set forth in the Agreement. In addition, CUSTOMER may also be charged the network fees on a per transaction per network basis, pursuant to Section 1.7 above.

CUSTOMER AGREES THAT THE ABOVE-REFERENCED NETWORK FEES ARE CONTROLLED BY SAID NETWORK(S) AND ARE SUBJECT TO CHANGE BY THE NETWORK(S) AND THEREFORE TO THE CUSTOMER AT ANY TIME. SERVICERS WILL USE COMMERCIALLY REASONABLE EFFORTS TO NOTIFY CUSTOMER PRIOR TO ANY EFFECTIVE CHANGE.

**1.8   Miscellaneous**

**1.8.1. Amendments.** If any of these terms and conditions are found to conflict with federal or state law, regulation or policy of the rules, these terms and conditions are subject to reasonable amendment by a state or its EBT service provider to address such conflict upon thirty (30) days written notice to CUSTOMER provided that CUSTOMER may, upon written notice, terminate your obligation under this Section 1 upon receipt of notice of such amendment.

**1.8.2. State Action.** Nothing contained herein shall preclude a state from commencing appropriate administrative or legal action against CUSTOMER or for making any Referral for such action to any appropriate federal, state, or local agency.

**1.9**   This Amendment, together with all exhibits attached hereto, constitutes the entire agreement between the parties regarding the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings. This Amendment shall affect only those provisions of the Addendum set forth herein and the remaining terms and provisions of the Addendum shall not be modified, amended or supplemented hereby and shall continue in full force and effect. In the event of a conflict between this Amendment and the Addendum as it relates to the subject matter hereof, the terms of this Amendment shall control. Otherwise, all terms and conditions of the Addendum and the Processing Agreement shall likewise apply to this Amendment.

| | |
|---|---|
| SCHNUCK MARKETS, INC. (CUSTOMER) | FIRST DATA MERCHANT SERVICES CORP. |
| By: _Scott C. Schnuck_ | By: _Paul Cwalina_ |
| Name: _Scott C. Schnuck_ | Name: _PAUL CWALINA_ |
| Title: _Chairman and C.E.O._ | Title: _SVP_ |
| Date: _October 6, 2011_ | Date: _10-10-11_ |

*(Legal)*

ATTACHMENT V- SERVICE LEVEL STANDARDS

REDACTED