UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SCHNUCK MARKETS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Case No. 4:13CV2226 JAR |
| FIRST DATA MERCHANT DATA SERVICES CORP., and | ) |
| CITICORP PAYMENT SERVICES, INC. | ) |
| | ) |
| Defendants. | ) |

**PLAINTIFF/COUNTERCLAIM DEFENDANT SCHNUCK MARKETS, INC.'S (1) MEMORANDUM IN OPPOSITION TO DEFENDANT/COUNTERCLAIM PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS; AND (2) MEMORANDUM IN SUPPORT OF ITS PARTIAL CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS**

Defendants/Counterclaim Plaintiffs First Data Merchant Services Corp. ("First Data") and Citicorp Payment Services, Inc.'s ("Citicorp") (collectively, "Defendants") have wrongfully withheld money owed to Plaintiff/Counterclaim Defendant Schnuck Markets, Inc. ("Schnucks") by blatantly disregarding the plain language of the parties' contract that limits liability for losses. To prevent Defendants from depriving Schnucks of the negotiated benefit of the bargain by re-writing the terms of the contract to give new meaning to a limitation of liability exception that does not apply to losses, Schnucks submits the following: (1) Memorandum in Opposition to Defendants' Motion for Judgment on the Pleadings ("Defendants' Motion"), and (2) Memorandum in Support of Schnucks' Partial Cross-Motion for Judgment on the Pleadings ("Plaintiff's Motion").

**I.      INTRODUCTION**

In March 2013, Schnucks disclosed that cybercriminals had launched an attack that targeted the payment cards of its customers.  As a result of the attack, the operating regulations

of Visa and MasterCard subject Schnucks' merchant acquiring bank, Defendant Citicorp, to liability to Visa and MasterCard for three different types of monetary amounts—a fine, a fee, and assessments of losses to reimburse banks that issued payment cards affected by the attack ("issuer losses").  Schnucks acknowledges that the fine and the fee are not subject to the $500,000 limitation applicable to losses, and those two amounts are not in dispute.  The dispute here is whether Defendants can avoid the clear limitation for losses negotiated by the parties by ignoring certain definitions and changing others so they can say losses are the same thing as fees or Third Party Fees, two terms found in an exception to the limitation of liability provision.

There are only two exceptions to the limitation of liability provision, and neither applies here.[1]  Defendants' sole and erroneous argument is that losses for which they withheld payment from Schnucks somehow fall under the second exception, which does not contain the word losses and only applies to "LIABILITY FOR CHARGEBACKS, SERVICERS' FEES, THIRD PARTY FEES, AND FEES, FINES OR PENALITIES [sic] BY THE ASSOCIATION OR ANY OTHER CARD OR DEBIT CARD PROVIDED UNDER THIS MSA OR ANY ADDENDA."  Indeed, none of these terms include the three types of issuer losses—fraud, operating expense, and reissuance losses—for which Visa and MasterCard regulations assign liability to Defendants.

To make the argument that losses mean the same thing as fees, Defendants ignore the text of the contract and instead include parentheticals containing words not found in the contract.  They also misleadingly paraphrase portions of the agreement to include terms that are not found in the agreement's plain text.  Defendants cannot rewrite the contract to meet their desired outcome.

---

[1] The first exception creates a limit of $3,000,000 that narrowly applies only to fines assessed for PCI DSS non-compliance.  Based on the plain meaning of fine, this exception is inapplicable to liability to reimburse issuers for their losses.  Defendants do not argue otherwise in their motion.

Defendants' sole argument fails and Plaintiff's Motion should be granted for the following reasons:

(1) **Losses are Specifically Limited by the Contract**.  The first sentence of the limitation of liability clause expressly states that Schnucks' liability for "ALL LOSSES", regardless of the form of action or legal theory, is limited to $500,000.

(2) **The Exception Relied Upon by Defendants Does Not Apply.**  The inapplicable exception on which Defendants rely excludes only "CHARGEBACKS, SERVICERS' FEES, THIRD PARTY FEES, AND FEES, FINES OR PENALITIES [sic]" from this limitation.

- **Issuer Losses are not Chargebacks.**  Chargebacks are a defined term—they are charges for returned or disputed purchases.

- **Issuer Losses Are Not Servicers' Fees, Third Party Fees, or Fees.** The plain meaning of a fee is an amount charged for the performance of a service. Servicers' Fees are the fees Defendants earn for their payment processing services. The defined term of "Third Party Fees" means monetary amounts charged by third parties in connection with the day-to-day processing services performed by Defendants.  These fees include the network and interchange fees payable to the appropriate card network and issuing bank each time a card is swiped in a Schnucks store that is processed by Defendants.  The word "losses" is not found in contract's definition of Third Party Fees, nor is any equivalent term.

- **Issuer Losses Are Not Fines or Penalties.**  A fine or penalty, as Missouri courts have explained, is not compensation or reparation for an injury; rather, it is a sum imposed as punishment.

- **The Absence of Other Defined Terms in the Exception is Significant**.  The contract contains a defined term, "Data Compromise Losses," the definition of

3

which encompasses all three types of liability Defendants are subject to (fines, fees, and issuing bank losses) as a result of the cyber-attack. The term Data Compromise Losses is notably missing from the list of forms of liability excepted from the limitation of liability clause. Also missing from the exception, and Defendants' Motion, are the Visa and MasterCard operating regulation programs (GCAR and ADCR) that define how Defendants' liability for issuing bank losses is calculated. The plain language of these regulations, which are incorporated as part of the contract, shows that assignment of liability for issuer losses under GCAR and ADCR are calculations of the actual losses and damages incurred by banks that issued cards targeted in the attack—they are not fees of any kind.

Defendants' Motion, which seeks to change defined terms in the contract so they can avoid the limitation of liability clause applicable to losses should be denied, and Plaintiff's motion seeking a declaratory judgment that its indemnification obligation to Defendants for amounts to reimburse issuing banks for their losses is limited by the parties' contract to $500,000 should be granted. Further, because Defendants are only permitted to establish a Reserve Account for the amount of fees and fines by Visa and MasterCard, Defendants should be ordered to return to Schnucks the amount in the Reserve Account that exceeds the amount of the Visa fine and MasterCard case management fee.

## II.   FACTS

### A.   Schnucks' Merchant Processing Relationships

To be able to accept payment cards from its customers, Schnucks needed an agreement with an acquiring bank (e.g. Citicorp) and a payment processor (e.g. First Data). These third parties facilitate authorization, settlement, and other functions associated with routing payment card transactions from the point-of-sale to the payment networks.  (Complaint, Doc. #9

4

("hereinafter Compl.), at ¶ 15.)  An acquiring bank like Citicorp "sponsors" a merchant like Schnucks into the Visa and MasterCard networks, and is responsible to Visa and MasterCard for ensuring that the merchant follows each network's operating regulations, as well as any consequences of non-compliance.  (*Id.* at ¶ 14.)  Visa and MasterCard do not issue cards, nor do they contract with merchants to process transactions; instead, they have contracts with acquiring banks and issuing banks.  (*Id.* at ¶ 13.)  Accordingly, a merchant like Schnucks will often have a three-party merchant services agreement that involves the merchant (Schnucks), acquiring bank (Citicorp), and payment processor (First Data).  (*Id.* at ¶ 15.)

B.     **The Agreements between the Parties**

In October 2011, Schnucks and First Data entered into a Master Services Agreement ("MSA"), which sets forth the terms and conditions by which First Data agreed to provide credit and debit card merchant transaction processing services for Schnucks.  (*Id.* at ¶ 16; Exhibit A to Defendants', Doc. # 37-1 (hereinafter "MSA").)  At the same time, Schnucks, First Data, and Citicorp entered into a Merchant Services Bankcard Addendum ("Bankcard Addendum"), which was incorporated into the MSA and sets forth the terms and conditions by which First Data and Citicorp collectively agreed to provide credit and debit card merchant transaction processing services for Schnucks.  (*Id.* at ¶ 16; Exhibit B to Defendants' Motion, Doc. #37-2 (hereinafter "Bankcard Addendum")  The MSA also incorporates the operating regulations of Visa and MasterCard ("Association Rules") and the Bankcard Addendum incorporates First Data's Program Terms and Conditions (or "Operating Procedures") and the Association Rules. (Addendum at §§ 4, 25 ("Per the terms of the Bankcard Addendum, CUSTOMER is required to follow the Operating Procedures and comply with the Association Rules as they may each be amended from time to time."); Exhibit C to Defendants' Motion, Doc. #37-3 (hereinafter "Operating Procedures"); Compl. at ¶ 17.)

5

1. **Relevant Provisions from the MSA**

The MSA that the parties negotiated provides the following limitation of liability provision:

> Limitation of Liability. NOTWITHSTANDING ANYTHING IN THIS MSA AND ANY ADDENDA TO THE CONTRARY, CUSTOMER [Schnucks], FDMS [First Data] AND ITS AFFILIATES' CUMULATIVE LIABILITY, IN THE AGGREGATE (INCLUSIVE OF ANY AND ALL CLAIMS MADE BY CUSTOMER, FDMS AND/OR ITS AFFILIATES, WHETHER RELATED OR UNLRELATED [sic]) **FOR ALL LOSSES, CLAIMS, SUITS, CONTROVERSIES, BREACHES, OR DAMAGES FOR ANY CAUSE WHATSOEVER (INCLUDING, BUT NOT LIMITED TO, THOSE ARISING OUT OF OR RELATED TO THIS MSA AND ANY ADDENDA) AND REGARDLESS OF THE FORM OF ACTION OR LEGAL THEORY SHALL NOT EXCEED $500,000.** NOTWITHSTANDING THE FOREGOING, CUSTOMER, FDMS AND ITS AFFILIATES' CUMULATIVE LIABILTY [sic] FOR ITS BREACH UNDER SECTION 25 (DATA SECURITY) SHALL NOT EXCEED $3,000,000. FOR PURPOSES OF CLARIFICATION, EITHER PARTY [sic] CUMMULATIVE [sic] TOTAL UNDER THIS CONTRACT SHALL NOT EXCEED $3,500,000. THIS SECTION 5.4 LIMITATION OF LIABILITY SHALL NOT APPLY TO CUSTOMER'S LIABILITY FOR CHARGEBACKS, SERVICERS' FEES, THIRD PARTY FEES, AND FEES, FINES OR PENALITIES [sic] BY THE ASSOCIATION OR ANY OTHER CARD OR DEBIT CARD PROVIDED UNDER THIS MSA OR ANY ADDENDA.

(MSA at § 5.4)(emphasis removed from other sentences.)

The MSA does not define the following terms from the last sentence of Section 5.4: "CHARGEBACKS, SERVICERS' FEES, THIRD PARTY FEES, AND FEES, FINES OR PENALITIES [sic] BY THE ASSOCIATION ..." However, several of these terms are defined in other incorporated documents.

2. **Relevant Provisions from the Bankcard Addendum**

A "Chargeback," which occurs when a cardholder disputes a charge or returns an item, is

defined by the Bankcard Addendum as "the procedure by which a Sales Draft or other indicia of a Card transaction (or disputed portion thereof) is returned to SERVICERS [Citicorp and First Data] by the Card Issuing Bank. CUSTOMER [Schnucks] must comply with the Association Rules, and is liable for all Chargebacks and related costs arising from CUSTOMER'S [Schnucks'] transactions." (Bankcard Addendum at Annex 1, p. 23, § 1.9.)

"Section 13 Fees; Adjustments, Collection of Amounts Due" of the Bankcard Addendum sets forth the terms by which Defendants, referred to as SERVICERS, charge Schnucks for the processing Services they provide. (*Id.* at § 13.) Although "SERVICERS' FEES" is not a defined term in the Bankcard Addendum, Section 13 details the various fees that "SERVICERS" may charge Schnucks, which includes all of the fees listed in Schedule A to the Bankcard Addendum, which encompasses, among others, Bankcard Service Fees (*Id.* at § 13 & Schedule A[2], p. 25.)

Section 13.3 of the Bankcard Addendum then defines the "Third Party Fees" that Schnucks is also obligated to pay when they are incurred in connection with Defendants' Services as:

> The fees for Services set forth in the Schedules may be adjusted to reflect increases or decreases by Associations in Interchange, assessment or other Association fees or to pass through increases charged by Third Parties for on-line communications. All such adjustments shall be CUSTOMER's responsibility to pay and shall become effective upon the date any such change is implemented by the applicable Association or other Third Party. CUSTOMER shall at all times be responsible for, payment of all fees and charges (including increases additions , or modification made thereto), without limitation, of any Credit Card Association, Network, card using organization, telecommunications provider, federal, state, or local governmental authority (each a "Third Party") including, without limitation any switch fee, issuer, reimbursement fee, adjustment fee, interchange fee, assessment fee or access fee, (collectively, Third Party Fees").

(*Id.* at § 13.3.)

---

[2] Defendants attached the Bankcard Addendum as Exhibit B to their Motion. (Doc # 37-2.) Defendants redacted Schedule A and Attachments I & II. Attached as Exhibit 1 is a modified version of Schedule A and Attachments I & II, which redacts the amount of the fees, but does not redact the types of fees charged by Defendants and third parties for their services.

The Bankcard Addendum does not define "FEES, FINES OR PENALITIES [sic] BY THE ASSOCIATION …" but it does state in Section 13.5 that "CUSTOMER [Schnucks] agrees to pay SERVICERS [First Data and Citicorp] any fines, fees, or penalties imposed on SERVICER by any Association, resulting from Chargebacks and any other fines, fees or penalties imposed by an Association with respect to negligent acts or omissions of CUSTOMER [Schnucks]." (*Id.* at § 13.5.)

### 3. Relevant Provisions from the Operating Procedures

Similar to the Bankcard Addendum, the Operating Procedures define a "Chargeback" as "[a] Card transaction (or disputed portion) that is returned to us[3] by the Issuer.[4]" (Operating Procedures at § 14 (Glossary).) "SERVICERS' FEES" and "FEES, FINES OR PENALITIES [sic] BY THE ASSOCIATION" are not defined terms in the Operating Procedures.

However, Section 4.9 of the Operating Procedures does create a defined term of "Data Compromise Losses" that includes all three types of monetary amounts, including losses, Defendants become subject to following a cyber-attack on a merchant they sponsor:

> If you or a Merchant Provider (or other Person used by you) are determined by any Card Organization, regardless of any forensic analysis or report, to be the likely source of any loss, disclosure, theft or compromise of Cardholder data or Card transaction information, or caused Cardholder data to be put at risk (together, 'Compromised Data Events') and regardless of your belief that you have complied with the Card Organization Rules or any other security precautions and are not responsible for the Compromised Data Event, *you must promptly pay us for all related expenses, claims, assessments, fines, losses, costs and penalties and Issuer reimbursements imposed by the Card Organizations against us (together 'Data Compromise Losses')*.

---

[3] "Us" refers to "Servicers" which is defined as "[f]or Visa and MasterCard Credit, Non-PIN Debit Card transactions, PIN Debit, Bank and Processor collectively…." (Operating Procedures at § 14 (Glossary).)

[4] "Issuer" is defined as "[t]he financial institution or Card Organization which has issued a Card to a Person." (*Id.*)

8

Operating Procedures at § 4.9 (emphasis added).[5]

### 4.     Relevant Provisions of GCAR and ADCR

The Visa International Operating Regulations[6] (hereinafter "VIOR") and MasterCard Security Rules and Procedures[7] (hereinafter "MasterCard Rules") do not define "Third Party Fees," "Servicers' Fees," or "fees, fines, or [penalties] by the Association." The VIOR and MasterCard Rules both set forth various fees, fines, and penalties that can be assessed under various circumstances, but their GCAR and ADCR programs do not refer to reimbursing issuing banks for their losses as a fee, fine, or penalty. (VIOR at 802-806; MasterCard Rules at § 10-1 through 10-29.)

Visa and MasterCard refer to cyber-attacks that affect payment card data as account data compromise events. (Compl. at ¶ 27.) If Visa maintains that a merchant was not "PCI DSS compliant" at the time of a data breach, it may assess a "non-compliance fine." (*Id.*) And under its GCAR program, Visa may issue a monetary assessment to recover and distribute to affected issuers a portion of their incremental counterfeit fraud losses and operating expenses due to an account data compromise event. (Compl. at ¶ 27; VIOR at 802) Indeed, the GCAR regulations state that they are an assignment of liability for loss to the acquirer for the purpose of reimbursing issuers for their losses:

> **Global Compromised Account Recovery Program Overview (Updated)**
> **Effective for Qualifying CAMS Events or VAB Events in which the first or only alert is sent on or after 15 May 2012,** an Issuer in Visa International or Visa Europe may recover a portion of its Incremental Counterfeit Fraud losses and operating expenses resulting from an Account Data Compromise Event involving a compromise of Magnetic-Stripe Data, and PIN data for events that

---

[5] This indemnity obligation is subject to the limitation of liability in Section 5.4 of the MSA, which states that it applies "NOTWITHSTANDING ANYTHING IN THIS MSA AND ANY ADDENDA TO THE CONTRARY …" (MSA at § 5.4.)

[6] The relevant portions of the Visa International Operating Regulations, October 15, 2012, are attached as Exhibit 2.

[7] The relevant portions of the MasterCard Security Rules and Procedures, February 22, 2013, are attached as Exhibit 3.

9

>also involve PIN compromise, under the Global Compromised Account Recovery (GCAR) program from an Acquirer(s) to whom liability for such loss has been assigned under the GCAR program.

(*Id.* (emphasis in original).)

Similarly, MasterCard may also levy a monetary assessment under its ADCR program to reimburse issuing banks for their losses. (Compl. at ¶ 27.) The MasterCard Rules state:

>ADC operational reimbursement enables an Issuer to partially recover costs incurred in reissuing Cards and for enhanced monitoring of compromised and/or potentially compromised accounts associated with an ADC Event. ADC fraud recovery enables an Issuer to recover partial incremental magnetic-stripe (POS 90) and/or Hybrid POS Terminal unable to process (POS 80) counterfeit fraud losses associated with an ADC Event. MasterCard determines ADC operational reimbursement and ADC fraud recovery.

(MasterCard Rules, at § 10.2.5.3.) MasterCard may also assess a "case management fee" for the investigation costs and other costs incurred by MasterCard in connection with an account data compromise event. (Compl. at ¶ 27.); MasterCard Rules at §10.2.6; July 11, 2012 MasterCard Account Data Compromise User Guide[8] (hereinafter "MasterCard ADC") at § 7.2.5.)

### C. The Cyber-Attack Against Schnucks

On March 30, 2013, Schnucks disclosed that it had found and blocked a cyber-attack against its payment card processing system (the "Attack"). (Compl., at ¶ 24). "The Attack involved the insertion of malicious computer code that searched for the presence of data from the magnetic stripe of payment cards swiped at certain affected Schnucks stores." (*Id.* at ¶ 25.)

### D. Card Network Assessments

As a result of Schnucks' data breach, "First Data received a preliminary case management report from MasterCard outlining the case management fee and the amount of monitoring/card replacement and fraud loss reimbursement it was assessing against Citicorp." (*Id.* at ¶ 28). "Based on the amount of MasterCard's assessment, First Data projected the total

---

[8] The MasterCard Account Data Compromise User Guide, July 11, 2012, is attached as Exhibit 4.

10

amount of Visa's assessment, including the amount it would assess for losses suffered by issuers of affected Visa cards associated with monitoring and card replacement, as well as counterfeit fraud losses." (*Id.* at ¶ 29). "Approximately 97% of the actual and projected amount of the assessments by the Networks was for reimbursement of losses claimed by issuing banks." (*Id*. at ¶ 30.)

### E. Defendants Establish a Reserve Account

The Bankcard Addendum permits Defendants to create and maintain a reserve account (the "Reserve Account") from Schnucks' payment card transaction flow. (Compl. at ¶ 19; Bankcard Addendum at § 22). Specifically, the Bankcard Addendum contemplates that the amount "will not exceed the sum of ... (v) the amount of any current and anticipated Association fees or fines." (Bankcard Addendum at § 22.1) First Data established the Reserve Account for the Associations' actual and projected assessments by "withholding a percentage each day from the funds First Data collected for Schnucks from the payment card transactions [First Data] processed at one [Schnucks'] store location." (Compl. at ¶¶ 30-31). To date, Visa has yet to finalize its assessment for Schnucks' data breach. (*Id.* at ¶¶ 29-30). The dollar amount held in the Reserve Account to cover "any current and anticipated Association fees or fines" well exceeds $500,000. (*Id.* at 33.)

### III. LEGAL STANDARD

In deciding a motion or judgment on the pleadings, the Court "accept[s] all facts pled by the nonmoving party as true and draw[s] all reasonable inferences from the facts in favor of the nonmovant." *United Here Local 74 v. Pinnacle Entertainment, Inc.*, 2011 WL 65934, at *2-3 (E.D. Mo. Jan. 10, 2011) (quoting *Waldron v. Boeing Co.*, 388 F.3d 591, 593 (8th Cir. 2004)). "Judgment on the pleadings is not properly granted unless the moving party has clearly established that no material issue of fact remains to be resolved and the party is entitled to

11

judgment as a matter of law." *Id.* (quoting *United States v. Any and All Radio Station Transmission Equip.*, 207 F.3d 458, 462 (8th Cir. 2000)). As stated in Federal Practice and Procedure:

> [A] Rule 12(c) motion is decided to provide a means of disposing of cases when the material facts are in not in dispute between the parties and a judgment on the merits can be achieved by focusing on the content of the competing pleadings, exhibits thereto, matters incorporated by reference in the pleadings, whatever is central or integral to the claim for relief or defense, and any facts of which the district court will take judicial notice.

*Id.* at *3 (quoting 5C Charles Alan Wright & Arthur Miller, Federal Practice and Procedure § 1367 (3d ed. 2010)). Here, based on the plain language of the parties' written agreements and incorporated documents, Defendants are not entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 12(c); rather, Schnucks is entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 12(c).

## IV.   ARGUMENT

The plain and unambiguous language of the limitation of liability provision in the parties' contract limits both Schnucks and First Data's liability to $500,000 "for all losses, claims, suits, controversies, breaches, or damages for any cause whatsoever …." (MSA at § 5.4.) This is not disputed. Therefore, unless one of the two exceptions to the limitation of liability provision applies, Schnucks indemnification obligation to Defendants for the assignment of liability for losses incurred by issuing banks is limited to $500,000. Based on the plain language of the terms in the contract negotiated by the parties, no exception applies to losses for assessments by Visa and MasterCard pursuant to their GCAR and ADCR regulations.

### A.   Unambiguous Limitation of Liability Provisions Are Enforced in Accordance with Their Plain Language

The MSA and, by incorporation, the Bankcard Addendum, Operating Procedures, and Association Rules, are all governed by Missouri law. (MSA at § 11.) In Missouri, when a contract uses plain and unequivocal language it must be enforced as written. *See, e.g., Turner v.*

12

*Sch. Dist. of* Clayton, 318 S.W.3d 660, 670 (Mo. 2010) (en banc); *Lake Cable, Inc. v. Trittler*, 914 S.W.2d 431, 436 (Mo. Ct. App. 1996). When a contract is unambiguous, the language used is given its natural, ordinary, and common-sense meaning, and the entire contract is considered to determine the intentions of the parties. *Chehval v. St. John's Mercy Medical Center*, 958 S.W.2d 36, 38 (Mo. Ct. App. 1997). Limitations of liability are valid if legitimately negotiated, clear, unambiguous, unmistakable, and conspicuous. *See Purcell Tire and Rubber Co., Inc. v. Executive Beechcraft, Inc.*, 59 S.W.3d 505 (Mo. 2001); *see also Liberty Financial Management Corp. v. Beneficial Data Processing Corp.*, 670 S.W.2d 40, 47 (Mo. App. E.D. 1984) (determining that a limited liability clause in a data processing contract was clear, unambiguous and conspicuous and finding support from Webster's Dictionary in determining that the "ordinary and common sense meaning" of a limited liability clause in a data processing contract). The validity of a liability limitation is a question of law for the court. *Warren v. Paragon Techs. Group, Inc.*, 950 S.W.2d 844, 845 (Mo. banc 1997).

### B.     Defendant's Cited Exception Does Not Apply.

It is clear from the plain language used, as well as the words and defined terms that were not used, that the second exception does not apply to liability for issuer losses assessed under the GCAR and ADCR regulations. The exception states: "THIS SECTION 5.4 LIMITATION OF LIABILITY SHALL NOT APPLY TO CUSTOMER'S LIABILITY FOR CHARGEBACKS, SERVICERS' FEES, THIRD PARTY FEES, AND FEES, FINES OR PENALTIES [sic] BY THE ASSOCIATION OR ANY OTHER CARD OR DEBIT CARD PROVIDED UNDER THIS MSA OR ANY ADDENDA." (MSA at § 5.4.)

#### 1.     The Plain Language of the Contract Bars Application of this Exception

"LOSSES", which are specifically limited to $500,000 in Section 5.4, does not appear in

13

the list of exceptions. The specific categories of delineated exceptions, either by their plain meaning or definition in other incorporated documents, do not encompass liability for losses to issuers.

"CHARGEBACK." A CHARGEBACK is a defined term that means the cost of a returned or disputed transaction. The Bankcard Addendum defines a "Chargeback" as "the procedure by which a Sales Draft or other indicia of a Card transaction (or disputed portion thereof) is returned to SERVICERS [Citicorp and First Data] by the Card Issuing Bank. CUSTOMER [Schnucks] must comply with the Association Rules,[9] and is liable for all Chargebacks and related costs arising from CUSTOMER'S [Schnucks'] transactions." (Bankcard Addendum at Annex 1, p. 23, § 1.9.) The Operating Procedures likewise define a "Chargeback" as "[a] Card transaction (or disputed potion) that is returned to us by the Issuer." (Operating Procedures at § 14 (Glossary).) A chargeback is not equivalent to a loss, and Defendants do not argue otherwise.

"SERVICERS' FEES." A review of Section 13 of the Bankcard Addendum demonstrates that SERVICERS' FEES means the fees Defendants charge to Schnucks for the payment processing services they themselves provide. It is also clear that SERVICERS means Defendants Citicorp and First Data, not Visa or MasterCard. Therefore, this exception does not apply to assessments by Visa and MasterCard pursuant to their GCAR and ADCR programs to reimburse issuing banks for their losses. Again, Defendants do not argue otherwise in their motion.

"THIRD PARTY FEES." "Third Party Fees" is a defined term in Section 13 of the Bankcard Addendum that follows the description of fees that Defendants may charge for their

---

[9] "Association Rules" are defined as "the rules, regulations, releases, interpretations and other requirements (whether contractual or otherwise) imposed or adopted by the Association." (Bankcard Addendum at Annex 1, p. 23, § 1.2.)

14

...

y

z

*services*. The term, by its definition, plainly means monetary amounts charged by third parties in connection with the day-to-day processing services performed by Defendants.

Defendants erroneously argue that: (1) "Third Party Fees," as defined by the Bankcard Addendum, include "fees related to fraud reimbursement and recovery" charged by Visa or MasterCard "as a result of a data compromise event"; and (2) that "FEES" as used in the exception include "reimbursements and assessments."  (Defendants' Memo. at 13-14.) Defendants also confusingly create a defined term of "Third-Party Fees," which they state means "fees charged by Visa or MasterCard to Defendants *as a result of the data breach*." (*Id*. at 2. (emphasis added).) No such term (using a dash) exists in the contract.

None of these assertions are supported by the actual language found in the agreement. The definition of "Third Party Fees" in the agreement makes no reference to "fraud reimbursement and recovery" or fees charged "as a result of a data breach." These terms are found only in the Defendants' Motion and Memorandum in Support, which ignore the plain language of the definition of Third Party Fees, the definition of GCAR and ADCR in the regulations, and the plain distinction between a fee (a charge for a service) and losses.  *See* Bankcard Addendum at § 13.3.

Indeed, it is plainly erroneous to contend that the definition of Third Party Fees in Section 13.3 of the Bankcard Addendum has anything to do with monetary amounts charged by Visa or MasterCard as a result of an account data compromise event.  First, the definition contains no mention that it relates to a compromise event.  Further, as set forth above, the definition of Third Party Fees, which is found in the section of the Bankcard Addendum related to the fees Defendants may charge for the services, clearly only apply to fees charged to Defendants by third parties in connection with the day-to-day processing services Defendants provide.

Notably, Defendants ignore that 13.3 of the Bankcard Addendum begins with "fees for

15

Services," which indicates that the enumerated "Third Party Fees" are intended to be "fees for Services."  This is supported by how these terms are used in the agreements and incorporated documents.  For example, the Schedule to the MSA specifically refers to "interchange fee," "access fee," and "assessment fee."  (Bankcard Addendum, Schedule A, p. 25).  While these terms are not specifically defined, the Schedule shows that they are a payment for a service.  In addition, the VIOR refer to "interchange reimbursement fee" as "a default transfer price between acquirers and issuers within the Visa system" (VIOR at 993-94); define an "access fee" as "[a] fee that is imposed by an ATM Acquirer as part of a Cash Disbursement Transaction, to a Cardholder for use of its ATM" (*Id.* at 1046);   refer to an "annual assessment fee" that an acquirer must pay (*Id.* at 782); and refer to "issuer fees" (*Id.* at 303, 702).  The MasterCard Rules refers to "issuer reimbursement fees" in the context of chargebacks.  (MasterCard Rules at §§ 8.3.3, 8.3.3.1, 8.3.4.)  Reading these documents as whole, it is abundantly clear that "Third Party Fees" refers to fees by the Association for a service related to processing transactions and not to reimburse issuer for losses.  *See Tuttle v. Muenks*, 21 S.W.3d 6, 11 (Mo. App. W.D. 2000) (noting that the terms of a written contract must be read in context and as a whole).

Defendants' argument is also in contravention of the language of the GCAR and ADCR regulations.  There is no reference or even support from the language of the GCAR and ADCR regulations that the issuer loss liability they assign to acquirers is in any way an "assessment fee" or a "reimbursement fee."  (*See* VIOR at 802-806, MasterCard Rules at § 10.1 through 10-10-29.)  These regulations simply do not use the word "fee" at all.  Visa's GCAR regulations explain how the calculation of losses incurred by issuing banks fall under the categories of "Incremental Counterfeit Fraud losses and operating expenses" and MasterCard similarly refers to the liability for losses as "operational reimbursement" and "fraud recovery").  (VIOR at 802; MasterCard Rules at § 10.2.5.3)

16

Whether through the creation of a defined term that does not exist in the contract or by adding parentheticals containing words not found in the text of the contract they cite, Defendants' "creative" attempts to make liability for losses mean the same thing as fees for services performed by Defendants and third parties is unavailing. (See Defendants' Memo. at 14.)

**"FEES, FINES OR PENALITIES [sic]."** Defendants assert in a conclusive and unexplained manner, that "FEES" include "reimbursements" and "assessments." (Defendants' Memo. at 13.) This bald assertion is not supported by any citation to a provision in the contract, and there is no place in the contract where the stand-alone term "fee" is ever defined as including "reimbursement" or "assessment" arising out of an account data compromise event.

Because the stand-alone terms of fees, fines, and penalties are not defined in the contract, they should be given their ordinary meaning. Missouri courts have given the terms "fine," "fee" and "penalty" in a contract their ordinary meanings. "The ordinary meaning of a 'fine' or 'penalty' is not compensation or reparation for an injury; rather, it is a sum imposed as punishment." *Farmland Indus., Inc. v. Republic Ins. Co.*, 941 S.W.2d 505, 511 (Mo. 1997) (citing Webster's Third New International Dictionary 852, 1668 (1961)). "Fee means 'a sum paid or charged for a service [,]' 'WAGES; esp: those of a servant' or '[a] charge for labor or services, esp. professional services." *Strader v. Progressive Ins.,* 230 S.W.3d 621, 625 (Mo. Ct. App. 2007) (citing Merriam Webster's Collegiate Dictionary, 459 (11th ed. 2005); Webster's Third New International Dictionary 833 (1976); Black's Law Dictionary 647 (8th ed. 2004)). As explained above, liability for losses to reimburse issuers for actual fraud and operating expense losses does not meet the ordinary meaning of a fee, fine, or penalty.

    **2.**    **It is Clear From the Words and Defined Terms Not Used That the Exception Does Not Apply**

17

If Defendants intended the second exception to exclude from the limitation of liability all forms of monetary amounts they would become liable for in the event of an account data compromise event at Schnucks, they could simply have said so. They could have written 'fines, fees, losses, or penalties." Or, they could have inserted the defined term Data Compromise Losses. Or, they could have inserted assessments according to the GCAR and ADCR regulations. But, they did not. Defendants used no words or defined terms evidencing intent to require unlimited indemnification for all forms of financial liability arising from an account data compromise event.

Defendants cite to and rely on the complete definition of Data Compromise Losses. (Defendants' Memo. at 6.). That definition includes all of the different types of monetary liability that may arise from an account data compromise event—claims, expenses, fines, losses, penalties, and issuer reimbursements imposed by Visa and MasterCard. The presence of this term in the contract demonstrates that Defendants were aware of all of the different types of liability. Defendants cannot change the terms of their agreement to limit liability for losses by claiming that a defined term in the exception means the same thing as a completely different defined term simply because they are unhappy with the outcome. *See Purcell Tire & Rubber Co. v. Exec. Beechcraft, Inc.*, 59 S.W.3d 505, 508 (Mo. 2001) (en banc) ("[s]ophisticated parties have freedom of contract—even to make a bad bargain, or to relinquish fundamental rights"); *Lion Oil Co. v. Tosco Corp.*, 90 F.3d 268, 270-71 (8th Cir. 1996) ("The fact that hindsight may have proven the Agreement to be a bad business decision … does not negate its validity."). Further, they cannot escape the application of the cap on liability by rewriting clearly defined terms in the contract. *See Rias v. Safeco Ins. Co. of Am.*, 594 F. Supp. 2d 1090, 1095 (E.D. Mo. 2009) ("Under Missouri law, a court must not alter or construct a new contract through interpretation.").

In sum, the plain and unambiguous language of this exception shows that it does not apply to liability for losses assigned by Visa and MasterCard pursuant to their GCAR and ADCR regulations to reimburse issuing banks for their fraud losses and operating expenses.

## V.     CONCLUSION

Defendants cannot ignore their agreement to limit Schnucks' liability to $500,000 for issuer losses liability under the Visa and MasterCard regulations by rewriting clear and unambiguous contract terms.  Accordingly, Schnucks motion for declaratory judgment should be granted and Defendants' Motion should be denied

Dated: June 9, 2014

Respectfully submitted,

By:     /s/ Kevin F. Hormuth
Kevin F. Hormuth, No. 48165 MO
David P. Niemeier, No. 50969 MO
GREENSFELDER, HEMKER & GALE, PC
10 South Broadway, Suite 2000
St. Louis, MO  63102
kfh@greensfelder.com
dpn@greensfelder.com
Telephone: 314.241.9090
Facsimile: 314.345.5466

Craig A. Hoffman (*pro hac vice*)
cahoffman@bakerlaw.com
Telephone:  513.929.3491
Facsimile:  513.929.0303

*Attorneys for Plaintiff Schnuck Markets, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on the 9th of June, 2014, the foregoing *Memorandum in Opposition to Defendant's Motion for Judgment on the Pleadings* was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: /s/ Kevin F. Hormuth
Kevin F. Hormuth