UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SCHNUCK MARKETS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 4:13CV2226 JAR |
| FIRST DATA MERCHANT DATA ) | |
| SERVICES CORP., and ) | |
| CITICORP PAYMENT SERVICES, INC. ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF'S PARTIAL CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS**

Plaintiff/Counterclaim Defendant Schnuck Markets, Inc. ("Schnucks") submits this Memorandum in further support of its Partial Cross-Motion for Judgment on the Pleadings.

**I.   INTRODUCTION**

The parties in this matter are sophisticated entities that entered into a commercial contract for payment processing services. The contract imposes indemnity obligations on Schnucks, but those indemnity obligations are subject to a limitation of liability that broadly applies to all losses. Defendants acknowledge that the limitation of liability provision is clear, unambiguous, and applies to Schnucks' indemnification obligations. Nevertheless, Defendants have ignored the limitation of liability and withheld more money from Schnucks than permitted for liability to reimburse issuing banks for their losses. Defendants seek to deny Schnucks the benefit of the negotiated limitation of liability by relying on a narrow exception that does not contain any words that unequivocally express intent to include issuer losses.

Schnucks' Cross-Motion demonstrated the flaws in Defendants' transparent attempt to rewrite the contract to make the exception apply. Defendants have failed to provide an effective

rebuttal to Schnucks' explanation of why liability to reimburse issuers for their losses is not a "Third Party Fee" or a "fee, fine, or penalty" as those terms are used in the exception. Unable to make their argument solely from the language of the contract, Defendants persist in building their argument on logical fallacies, invented terms, and misleading paraphrasing of the contract.

The sole exception on which Defendants rely, which they admit is not ambiguous, enumerates a specific list of fees, fines, and penalties that are excluded from the limitation, but it does not list anything equivalent to issuer losses or that can even be characterized as issuer losses. Indeed, the exception does not contain the word losses, damages, the defined term Data Compromise Losses, any reference to the rules that create the liability for issuer losses, or any reference to liability for a data compromise event. Using the actual words in the contract, and following traditional Missouri contract interpretation principles, which Defendants reference but fail to follow, leads to only one conclusion—the exception does not apply to issuer losses.[1]

Defendants cannot escape the inevitable conclusion that the defined terms and the plain meaning of undefined terms in the exception—both on their face and in the context of the entire contract—make it clear that the exception does not apply to issuer losses. Accordingly, Schnucks' indemnity obligation for issuer losses is limited to $500,000 and Schnucks' Partial Cross-Motion for Judgment on the Pleadings should be granted.

## II.     THE EXCEPTION DOES NOT APPLY TO LIABILITY FOR ISSUER LOSSES

After the criminal cyber-attack against Schnucks, Defendants demanded indemnity from Schnucks for liability Defendant Citicorp (as Schnucks' acquiring bank sponsor) incurred to Visa

---

[1] "An essential principle of contract interpretation is to ascertain the intent of the parties. The terms of a contract are read as a whole to determine the intention of the parties and are given their plain, ordinary, and usual meaning. It is also important to note that a contract is only ambiguous, and in need of a court's interpretation, if its terms are susceptible to honest and fair differences. A contract is not ambiguous merely because the parties disagree as to its construction. If the language of a contract is unambiguous, the intent of the parties will be gathered solely from the terms in the contract. Furthermore, each term of a contract is construed to avoid rendering other terms meaningless." *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 859-860 (Mo. Banc 2006) (internal quotations and citations omitted).

and MasterCard for three different types of monetary amounts—a fine, a fee, and reimbursement of losses incurred by banks that issued payment cards affected by the attack.  Schnucks does not argue that the fine assessed by Visa or the fee assessed by MasterCard are subject to the $500,000 limitation.  The only dispute here is whether Defendants can avoid the limitation of liability for all losses by arguing that liability to reimburse issuing banks for their losses falls under an exception that only applies to "Third Party Fees" or "a fee, fine or penalty" by Visa and MasterCard.  The plain language of the exception, when viewed in the context of the agreement as a whole, does not support Defendants' arguments.

The limitation of liability provision in the parties' contract broadly limits Schnucks liability to $500,000 "for all losses, claims, suits, controversies, breaches, or damages for any cause whatsoever . . . regardless of the form of action or legal theory."  (Exhibit A to Def.'s Mot., Doc. # 37, MSA at § 5.4.)  The limitation is followed by two specific exceptions:

- NOTWITHSTANDING THE FOREGOING, CUSTOMER, FDMS AND ITS AFFILIATES' CUMULATIVE LIABILTY [sic] FOR ITS BREACH UNDER SECTION 25 (DATA SECURITY) SHALL NOT EXCEED $3,000,000.

- THIS SECTION 5.4 LIMITATION OF LIABILITY SHALL NOT APPLY TO CUSTOMER'S LIABILITY FOR CHARGEBACKS, SERVICERS' FEES, THIRD PARTY FEES, AND FEES, FINES OR PENALITIES [sic] BY THE ASSOCIATION OR ANY OTHER CARD OR DEBIT CARD PROVIDED UNDER THIS MSA OR ANY ADDENDA.

(*Id*.)

The second exception—the only one Defendants claim covers issuer losses—applies only to: (1) fees charged by Defendants or third parties in connection with transaction processing services; and (2) fees or punitive amounts (i.e. fine or penalty) charged by Visa or MasterCard.[2]  On its face, the exception does not contain any terms equivalent to the liability for issuer losses

---

[2] The first exception creates a separate $3,000,000 limitation for fines for PCI DSS non-compliance.  Defendants do not contend that this exception applies to issuer losses.

3

(e.g. losses from fraudulent charges) that Visa and MasterCard regulations impose. The Visa and MasterCard programs (GCAR and ADCR, respectively), which are incorporated into the contract, are liquidated damages provisions that assign liability for actual losses and damages incurred by banks that issued cards targeted in the attack. (Schnucks' Cross-Motion, Doc. #44, at 9-10; & Exhibits 2-4).[3] They are not fees, fines, or penalties of any kind. Thus, the defined terms and the plain meaning of undefined terms of the exception make it clear that the exception does not apply to liability for issuer losses.

### A.   It is Clear From the Words and Defined Terms Not Used That the Exception Does Not Apply

If Defendants, who are sophisticated entities, intended the second exception to exclude from the limitation of liability all forms of monetary amounts they might become liable for in the event of an account data compromise event at Schnucks, as they now claim, they could simply have said so. They could have added in the word "losses" and written "fines, fees, penalties or **losses** . . ." Or, they could have inserted the defined term "Data Compromise Losses," the definition of which encompasses all forms of financial liability arising from an account data compromise event (including losses and issuer reimbursements imposed by Visa and MasterCard). Or, they could have inserted "assessments according to the GCAR and ADCR regulations." But, they did not. Defendants used no words or defined terms in the exception evidencing intent to exclude from the $500,000 limitation of liability all forms of financial liability arising from an account data compromise event.

Defendants try to downplay the significance of the absence of the defined term "Data Compromise Losses" in the exception. If Defendants had intended for the exception to have the meaning that they now claim it does, using "Data Compromise Losses" would have clearly

---

[3] Visa maintains that its operating regulations permit it to assign liability to acquiring banks for issuer losses arising from account data compromise events as a valid liquidated damages provision and not an unenforceable penalty. *See Genesco, Inc. v. Visa U.S.A., Inc*., Case No. 3:13cv202, 2013 WL 3790647 (M.D. Tenn. July 18, 2013).

manifested that intent.  The absence of "Data Compromise Losses" or any equivalent language severely undermines Defendants' position.  Defendants cannot now change the terms of the contract after the fact to meet their desired outcome.  *See Rias v. Safeco Ins. Co. of Am.*, 594 F. Supp. 2d 1090, 1095 (E.D. Mo. 2009) ("Under Missouri law, a court must not alter or construct a new contract through interpretation.").

**B.     Issuer Losses Are Not Third Party Fees**

In contrast to liability for actual issuer losses, the plain meaning of a fee is an amount charged for the performance of a service.  Similarly, the defined term of "Third Party Fees" is created in the section of the contract that sets forth the terms by which Defendants charge Schnucks for the processing Services they provide ("Section 13 Fees; Adjustments, Collection of Amounts Due"):

> The fees for Services set forth in the Schedules may be adjusted to reflect increases or decreases by Associations in Interchange, assessment or other Association fees or to pass through increases charged by Third Parties for on-line communications.  All such adjustments shall be CUSTOMER's responsibility to pay and shall become effective upon the date any such change is implemented by the applicable Association or other Third Party.  CUSTOMER shall at all times be responsible for, payment of all fees and charges (including increases additions , or modification made thereto), without limitation, of any Credit Card Association, Network, card using organization, telecommunications provider, federal, state, or local governmental authority (each a "Third Party") including, without limitation any switch fee, issuer, reimbursement fee, adjustment fee, interchange fee, assessment fee or access fee, (collectively, Third Party Fees").

(Exhibit B to Def.'s Mot., Doc. # 37, Bankcard Addendum at § 13.3.)  The definition of Third Party Fees shows that it is a term exclusively reserved for fees charged by third parties in connection with the processing of transactions, such as the interchange fee payable to the issuing bank of a card each time the card is used.

5

Defendants erroneously attempt to equate liability for actual losses incurred by issuing banks to a "fee" or "Third Party Fee."[4] Similar to what Defendants did in their Motion for Judgment on the Pleadings, they invent a term and then define that invented term without any support. Specifically, in their Opposition Memorandum, Defendants created and conveniently defined the term "issuer reimbursement fees" as "assessments for the purpose of reimbursing issuing banks whose credit and debit card using consumers have suffered losses as a result." (*Id.*) This defined term is found nowhere in the parties' contract. It is a definition created by Defendants to facilitate their argument. Defendants next remove an "inadvertent comma" in the contract's definition of "Third Party Fees" to create the term "issuer [] reimbursement fee." (Def.'s Opp., Doc. #49, at 4.) Defendants then deceptively argue that their newly coined term of "issuer reimbursement fees" (not the actual text of "issuer [] reimbursement fee") is included in the contract's defined term of "Third Party Fees" and, thus, excluded from the limitation by the exception. The problems with this argument are numerous.

Defendants had to alter the contract to say that an "issuer [] reimbursement fee" is a type of "Third Party Fees" under the contract. They then switch from "issuer [] reimbursement fee" to using "issuer reimbursement fees," a term they created in their Opposition Memorandum to mean "assessments for the purpose of reimbursing issuing banks whose credit and debit card using consumers have suffered losses as a result."[5] Only through this sleight of hand can Defendants argue that issuer losses are "issuer reimbursement fees." There is no reference or even support from the language of the GCAR and ADCR regulations—which Defendants continue to ignore—that the issuer loss liability they assign to acquirers is in any way an "issuer reimbursement fee," "assessment fee," "reimbursement fee," or any fee at all. (*See* Exhibit 2 to

---

[4] Defendants do not contend that issuer losses are Chargebacks or Servicer's Fees.

[5] Defendants do not explain why they believe the comma was inadvertent. They just altered the agreement for the convenience of making this new argument.

Schnucks' Cross-Motion, Doc. #44-2, Visa International Operating Regulations ("VIOR") at 802-806 [hereinafter "VIOR"], Exhibit 3 to Schnucks' Cross-Mot., Doc. #44-3, MasterCard Security Rules and Procedures at § 10.1 through 10-10-29 [hereinafter, "MasterCard Rules"].) These liquidated damages provisions assigning liability for losses simply do not use the word "fee" at all.  To the contrary, they explicitly use the word losses (e.g. Visa's GCAR regulations explain how the calculation of losses incurred by issuing banks fall under the categories of "Incremental Counterfeit Fraud losses and operating expenses" may be recovered "from an Acquirer(s) to whom liability for such loss has been assigned under the GCAR program.") (VIOR at 802; MasterCard Rules at § 10.2.5.3.)

The flaws in Defendants' attempt to characterize liability for issuer losses as a fee are further evident because:

- In the definition of "Data Compromise Losses" in the Operating Procedures, there is no reference to fees.  Rather,  liability under the GCAR and ADCR programs are referred to as ". . . *Issuer reimbursements imposed by the Card Organizations against us . . .*" (Exhibit C to Def.'s Mot., Doc. # 37, Operating Procedures at § 4.9.)  Indeed, Defendants' interpretation of Third Party Fees would render Section 4.9 of the Operating Procedures superfluous.

- Reading "Third Party Fees" in the context of the Section 13 of the Bankcard Addendum, the section in which it is defined, demonstrates that the enumerated "Third Party Fees" are fees charged by third parties in connection with Defendants' processing Services. This is supported by how these terms are used in the agreements and incorporated documents.  (Schnucks' Cross-Motion, Doc. # 44 at 15-16.)

- The MasterCard operating regulations actually contain the term "issuer reimbursement fees," and that term is used solely in the context of excessive chargebacks (not an account data compromise event and certainly not as an assessment for purpose of reimbursing issuing banks). (MasterCard Rules at §§ 8.3.3, 8.3.3.1, 8.3.4.)[6]

---

[6] Defendants misstate Schnucks' argument.  (Def.'s Opp., Doc. # 49, at 6 n.4.)  Schnucks is not arguing that chargebacks are the same things as issuer reimbursement fees.  Schnucks is asserting, consistent with the MasterCard operating regulations, that issuer reimbursement fees are charged as a result of *excessive* chargebacks. (MasterCard Rules at §§ 8.3.3, 8.3.3.1, 8.3.4.)  Once again, Defendants ignore the plain language of the operating regulations.

7

No matter how many terms they invent, Defendants cannot change the fact that the monetary liability under the GCAR and ADCR regulations constitutes liability for losses—they are not fees.[7] Because Defendants are seeking indemnification for their liability for those losses, the limitation of liability applies, but the exception for Third Party Fees does not.

### B.     Issuer Losses Are Not Fees, Fines or Penalties

Defendants' second, and even less clearly articulated argument, is that "[t]he terms 'fees,' 'fines,' and 'penalties' are used throughout the MSA to mean *assessments* by 'Third Parties' – the Associations – related to data compromise events…." (Def.'s Opp., Doc. # 49, at 7 (emphasis added).)  Essentially, instead of using the defined term of "Data Compromise Losses," Defendants argue that the "FEES, FINES OR PENALITIES [sic] BY THE ASSOCIATION" clause in the exception means the same thing as "Data Compromise Losses."  There is absolutely no support in the contract for this argument.

Defendants attempt to construct this erroneous argument by asserting that the Operating Procedures provide that "Schnucks is responsible to pay for all assessments by the Associations related to a 'Data Compromise Event.'" (*Id.* at 8.)[8]  This assertion only shows that an indemnification obligation exists, it does not and cannot show that the exception applies. Defendants next assert that "the fully integrated agreement includes within 'fees,' 'fines,' and/or 'penalties' the assessments by the Associations arising out of Schnucks' PCI non-compliance

---

[7] Further, Defendants persist in offering the invalid contention that Schnucks admits that liability for issuer losses is included in the exception. (Def's Opp., Doc. #49, at 3-4.)  It is only through Defendants' tortured and erroneous interpretation of the contract that allows them to make this assertion.  Schnucks has not made any admissions as Defendants wrongly contend.  Indeed, the factual allegation Defendants erroneously rely on to make their assertion is Schnucks allegation that approximately 97% of the financial liability for which Defendants are seeking indemnity is liability for issuer losses.

[8] The term "Data Compromise Event" is not found in section 4.9 of the Operating Procedures.  That section refers to "Data Compromise Losses."  Once again, Defendants create a term out of whole cloth to support their position.

8

and resulting data breach." (*Id.*)[9] Defendants only reference two examples to support this contention, and neither have anything to do with an account data compromise event. For good measure, Defendants then reiterate their conclusory and unsupported contention that "fees," "fines," and "penalties" as well as "Third Party Fees" apply to all of the Associations' assessments for Schnucks' data breach. (*Id.*)

Defendants did not include "Data Compromise Losses" in the exception and they cannot rewrite the contract after the fact to turn undefined terms that only include portions of the categories of liability included in the definition of "Data Compromise Losses" into the full equivalent of the defined term. Indeed, the term "Data Compromise Losses" includes "all related expenses, claims, assessments, fines, losses, costs and penalties and Issuer reimbursements imposed by the Card Organizations against us." (Operating Procedures at § 4.9.) It is incomprehensible how Defendants can assert that "fees, fines, and penalties" alone cover all of those different categories of losses.

The two examples cited by Defendants have nothing to do with an account data compromise event—the first is a generic indemnity obligation and the second relates to an obligation to pay for a fine for non-compliance with PCI DSS (this fine can occur even when there is not an account data compromise event, including if a merchant fails to submit their annual validation of compliance with PCI DSS). (Def.'s Opp., Doc. # 49, at 7.) Defendants do not explain for either example why Schnucks' indemnity obligation to pay "any fines, fees, or penalties" imposed by Visa or MasterCard for "negligent acts or omissions" or Schnucks indemnity obligation to pay "any and all fines" for non-compliance with PCI DSS somehow

---

[9] If Defendants' contention were true that the indemnity obligation owed under Section 25 of the Bankcard Addendum for PCI DSS non-compliance fines means that Schnucks has unlimited liability for all assessments arising from a breach under the second exception to the limitation, then there would be no reason to have the first exception to the limitation of liability, which expressly creates a $3,000,000 limitation for PCI DSS non-compliance fines under Section 25. Such an interpretation cannot be correct because it would render the first exception superfluous.

9

transforms the clause of "fines, fees, or penalties" in the exception into a defined term that means the same thing as "Data Compromise Losses."

The guise of reading the contract as a whole does not permit Defendants to make the existence of an indemnity obligation by Schnucks for issuer losses double as evidence of intent by the parties that the exception applies to issuer losses.  (Def.'s Opp., Doc. # 49, at 1-4.)  In other words, Defendants imply that the existence of an indemnity obligation shows intent that the indemnity obligation is unlimited.  This argument fails because Defendants acknowledge that the limitation of liability provision applies to the indemnity obligations.  It also fails because it is contravened by the opening clause of the limitation of liability provision, which makes it clear that it applies  "NOTWITHSTANDING ANYTHING IN THIS MSA AND ANY ADDENDA TO THE CONTRARY, . . ."  (MSA at § 5.4.)  Otherwise, the limitation of liability provision, which Defendants acknowledge applies to the indemnification obligations, would be rendered superfluous.  *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 859-860 (Mo. Banc 2006) ("[E]ach term of a contract is construed to avoid rendering other terms meaningless.") (internal citations and quotations omitted).

Contrary to Defendants' argument, Schnucks interpretation does not render the exception devoid of meaning or lead to an absurd result.  (Def.'s Opp., Doc. # 49, at 10.)  In fact, Visa assessed a non-compliance *fine* and MasterCard assessed a case management *fee*.  Schnucks acknowledges that the exception applies to that fine and fee, and those two amounts are not in dispute.  Schnucks is asserting, consistent with the parties' limitation of liability provision, that its indemnity obligation to Defendants for issuer losses is limited to $500,000.  Such a finding does not render the exception devoid of meaning or lead to an absurd result.[10]

---

[10] Defendants oddly contend that applying the limitation of liability would somehow reward Schnucks for not being PCI DSS compliant.  Quite simply, Schnucks has incurred financial consequences since becoming the victim of a crime and it sees nothing related to the attack as a "reward."  It simply wants to enforce the contract as written.

## II.     CONCLUSION

For the foregoing reasons, Schnucks respectfully request that this Court grant its Partial Cross-Motion for Judgment on the Pleadings; deny Defendants' Motion for Judgment on the Pleadings; dismiss Defendants' Counterclaim; and grant judgment to Schnucks on its declaratory judgment claim.

Dated: July 7, 2014

Respectfully submitted,

By:     /s/ *Kevin F. Hormuth*
Kevin F. Hormuth, No. 48165 MO
David P. Niemeier, No. 50969 MO
GREENSFELDER, HEMKER & GALE, PC
10 South Broadway, Suite 2000
St. Louis, MO  63102
kfh@greensfelder.com
dpn@greensfelder.com
Telephone: 314.241.9090
Facsimile: 314.345.5466

Craig A. Hoffman (*pro hac vice*)
cahoffman@bakerlaw.com
Telephone:  513.929.3491
Facsimile:  513.929.0303

*Attorneys for Plaintiff Schnuck Markets, Inc.*

## CERTIFICATE OF SERVICE

I certify that on the 7th of July, 2014, the foregoing *MEMORANDUM IN FURTHER SUPPORT OF PLAINTIFF'S PARTIAL CROSS-MOTION FOR JUDGMENT ON THE PLEADINGS* was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

By: /s/ *Kevin F. Hormuth*
Kevin F. Hormuth