# EXHIBIT B
# [REDACTED]

# BakerHostetler

Baker&Hostetler LLP

312 Walnut Street
Suite 3200
Cincinnati, OH 45202-4074

T 513.929.3400
F 513.929.0303
www.bakerlaw.com

August 15, 2013

Craig A. Hoffman
direct dial: 513.929.3491
cahoffman@bakerlaw.com

Pamela DeMars
Senior Business Leader
Fraud Investigations
MasterCard Worldwide
Payment System Integrity
2200 MasterCard Blvd.
O'Fallon, MO 63368

Re:   Appeal of Financial Acquirer Financial Responsibility Report
      Concerning Schnucks

Dear Ms. DeMars:

Pursuant to section 10.2.7 of the MasterCard *Security Rules and Procedures* manual (the "Manual"), Schnuck Markets, Inc. ("Schnucks"), through its acquirer, submits this appeal to MasterCard's July 12, 2013 Final Acquirer Responsibility Report (the "Acquirer Report"). The Acquirer Report imposed financial liability of $[redacted] for Operational Reimbursement and Fraud Recovery associated with [redacted] purportedly eligible MasterCard accounts. In addition, MasterCard has assessed a $[redacted] case management fee. Schnucks respectfully requests that MasterCard rescind its liability assessment and case management fee. Under the circumstances, MasterCard's assessment is contrary to its rules, violates due process, and amounts to an unenforceable penalty.

First, the compromise of Schnucks' systems was caused by a flaw in Retalix, a PA-DSS validated system that was momentarily storing unencrypted data despite representations by its developer that data was never unencrypted. MasterCard was aware of attacks against grocers targeting this flaw in payment applications by at least January 2013. If MasterCard had issued a warning at that time, Schnucks could have stopped the attack in its infancy. Blocking the attack in January 2013 would have prevented hundreds of thousands of MasterCard accounts from being at risk. It is fundamentally unfair and capricious for MasterCard to take millions of dollars from Schnucks when MasterCard failed to act to mitigate this risk.

Second, the liability assessed is not supported by evidence. MasterCard incorrectly assessed liability based on its arbitrary determination that ▓▓▓ accounts were at risk. The PFI report demonstrates that a significant number of those accounts were never at risk because the card harvesting script only ran every 20 seconds. At most, only ▓▓▓ cards were actually at risk of being written by the script to a file. Moreover, the PFI found no evidence that any files containing card data harvested by the script were actually taken. Ignoring the forensic evidence and imposing liability that bears no relationship to any actual loss is not only arbitrary and capricious, it constitutes an unenforceable penalty.

Third, MasterCard failed to follow its rules and abused its discretion by failing to eliminate or reduce the assessment of liability pursuant to section 10.2.5.2 of the Manual. After considering the actions by Schnucks before, during, and after the event, the factors MasterCard states that it will consider in determining the overall financial liability weigh strongly in favor of the elimination or substantial reduction of liability. Indeed, Schnucks was validated as PCI DSS compliant by its QSA one month before the attack began, it worked diligently to find and block the attack, the attack exploited a vulnerability in a PA-DSS validated payment application, Schnucks cooperated fully during the investigation, and it is in the process of revalidating PCI DSS compliance as well as exploring the implementation of a tokenization solution to remove plain text card data from its environment completely.

Background

On March 15, 2013, First Data notified Schnucks of a possible account data compromise following the receipt of common-point-of-purchase data. Schnucks immediately launched an internal investigation and provisionally ruled out several possible causes, such as employee wrongdoing or point-of-sale device tampering. On March 19, as additional compromised cards were reported, Schnucks engaged Mandiant to serve as a PFI. Mandiant was onsite by March 22 and began the process of scanning Schnucks' network with their MIR tool.

Late in the day on March 28, Mandiant identified the first indicator of compromise and recommended that Schnucks execute a ten-point containment plan. Within 48 hours, Schnucks worked with Mandiant to successfully implement the recommended containment plan, which blocked the attack from continuing. Schnucks and Mandiant provided regular status updates to MasterCard and the other card associations as Mandiant worked to identify the scope of the attack.

Mandiant issued its Final PFI Report on May 29, 2013. The report contained a finding that an attacker "had harvested card holder data at ▓ Schnucks stores between December 9, 2012 (or December 10, 2012 in some instances) and March 30, 2013" through the use of memory-scraping malware. The malware executed a script that would search process memory every 20 seconds for Track 2 data, and then send any such card data to an output file. However, Mandiant did not find any evidence to prove that cardholder data was stolen from the environment, even though the attacker had the means and technical capability to do so. Mandiant recovered ▓▓ output files that were created by the malware

2

from March 28 – 30, 2013. Schnucks compared the number of cards in the output files to the total number of cards that were swiped at Schnucks during that time frame and found that the malware only wrote approximately ▇% of all transactions to an output file.

Since it discovered and blocked the attack, Schnucks has provided helpful information about the nature of the attack to other grocery merchants so they could prevent a similar attack. Schnucks expects to be validated as PCI DSS compliant by its new QSA, Verizon, by November 2013. Schnucks is also exploring implementation of tokenization so that card data is never present in plain text in its environment.

(1) The Assessment Must Comply with Due Process.

Under New York law, private associations, when they operate as near monopolies, must apply their rules such that they comport with due process.[1] Specifically in the context of private associations, courts have recognized that "due process comes down to a kind of fundamental fairness, measured by tradition and conscience."[2] Under this standard, the actions of private organizations are invalid unless they are free from arbitrary and capricious rules that lead to actions unsupported by substantial evidence.[3] And New York courts have ruled "that any determination that lacks substantial evidence . . . would necessarily be an arbitrary and capricious decision."[4] Under both the substantial evidence rule and the arbitrary and capricious standard, courts will review the actions of private associations for rationality.[5] As set forth below, MasterCard's assessment of liability and the case management fee violate due process because they are not supported by substantial evidence. Rather, the assessments are contradicted by the evidence, and thus they are fundamentally unfair, arbitrary, and capricious.

(2) MasterCard Acted Unfairly and Capriciously by Failing to Warn Schnucks.

MasterCard's own rules, at Section 10.2.1, contemplate that the MasterCard Standards are designed to place responsibility for ADC Events on the participant in the payment system that "is in the best position to guard against and respond to such risk." In this case, MasterCard had the ability to substantially limit the attack against Schnucks. It failed to do so. Any assessment that does not reflect MasterCard's own culpability would amount to a failure by MasterCard to apply its rules in accordance with due process as well as MasterCard's duty to mitigate damages. [6]

---

[1] See *Lindemann v. Am. Horse Shows Assoc.*, 624 N.Y.S.2d 723, 730, 164 Misc.2d 937, 949 (1994) (collecting cases and quoting *Jacobson v. New York Racing Association, Inc.*, 33 N.Y.2d 144, 150, 350 N.Y.S.2d 639, 305 N.E.2d 765 (1973)).
[2] *Id.* (quoting *Matter of Ryan v. Hofstra Univ.*, 67 Misc.2d 651, 670, 324 N.Y.S.2d 964 (1971)).
[3] *Id.* (citing *Fuller v. Urstadt*, 28 N.Y.2d 315, 318, 321 N.Y.S.2d 601, 270 N.E.2d 321 (1971)).
[4] *Id.* (quoting *ARC Plumbing & Heating Corporation v. Board of Responsibility*, 135 Misc.2d 413, 414, Fn. 1, 515 N.Y.S.2d 685 (1987).
[5] *Id.* (citing *Matter of 125 Bar Corp. v. State Liq. Auth.*, 24 N.Y.2d 174, 178, 299 N.Y.S.2d 194, 197-198, 247 N.E.2d 157, 158-159 (1969); 1 N.Y.Jur., Administrative Law, § 184).
[6] 36 N.Y. JUR. 2D Damages § 25 (2010); *Fed. Ins. Co. v. Walker*, 53 N.Y.2d 24 (1981).

The group that attacked Schnucks attacked other grocery stores before Schnucks. MasterCard was aware of these prior attacks, which were carried out using a similar method of scraping magnetic stripe card data from the process memory of POS systems. Despite having knowledge of the attack vector, the vulnerability of POS systems that store track data in process memory, and understanding the liability that could flow from this type of attack, MasterCard failed to warn its issuers and acquirers. Had MasterCard done so, Schnucks' acquirer and processor could have used that intelligence to help Schnucks stop the attack in its earliest stages. Visa issued such a warning, but not until April 11, 2013.[7] The first two sentences of the alert show that Visa, and by implication MasterCard given that PFI reports are shared with all card associations, knew of this threat by at least by January 2013:

> Since January 2013, Visa has seen an increase in network intrusions involving grocery merchants. Once inside a merchant's network, hackers install memory-parsing malware on Windows-based cash register systems or back-of-house (BOH) servers to extract full magnetic-stripe data.

MasterCard touts the fact that the billions of transactions it processes every year "gives MasterCard a unique perspective of the data security landscape" and "the opportunity to provide a wealth of data security information that financial institutions, merchants, and cardholders can use to support the overall integrity of the payment card network."[8] Despite MasterCard's prior knowledge of these attacks and its acknowledgement that it had the ability to help merchants prevent attacks, MasterCard failed to help prevent the supposed damages it now seeks to recover.[9]

**(3) Only ▇% of Daily Transactions Were At Risk—Not 100% as MasterCard Has Assumed.**

There is strong evidence that the number of at risk cards is significantly less than the total number of unique cards used at Schnucks during the at risk time period. As explained below, an analysis of the forensic evidence compiled by Mandiant demonstrates that the malware likely captured only approximately ▇% of the transactions processed during a day. Put differently, for any transaction at an affected store, that transaction had an approximately ▇% chance of not being captured by the malware script. Moreover, Mandiant found no evidence of actual theft of card data.[10]

*(a) Calculation of the ▇% Capture Rate*

---

[7] http://usa.visa.com/download/merchants/alert-prevent-grocer-malware-attacks-04112013.pdf
[8] http://www.mastercard.com/us/company/en/whatwedo/resources.html
[9] MasterCard's rules expressly permit sharing of information for this specific purpose: "For the purpose of protecting against or preventing actual or potential fraud, unauthorized transactions, claims, or other liability, including to third parties providing these services." MasterCard Rules 3.6.2.
[10] "Evidence was not discovered to prove that card holder data was stolen from the environment, although the attacker had the means and technical capability to perform this activity." May 29, 2013 Mandiant Final PFI Report, p. 2.

4

As indicated in Mandiant's PFI report, customer credit and debit cards were harvested by the operation of memory-scraping malware on the servers in the back of affected stores that processed transactions (the "MTX boxes"). Every twenty seconds, the malware script would scan the process memory of the MTX boxes and write any Track 2 data that was present to an output file.

Mandiant was able to recover output files created by the malware script across various stores for the limited time period of March 28, 2013 to March 30, 2013. Schnucks compared the credit and debit cards present in the output files to all transactions processed at those stores during the time the script was running.[11] The card data in each output file was then compared against all transactions from each store for the same period of time. Out of the total of ▮ credit and debit card transactions during the relevant time, the output files only contained ▮ cards. Thus, only ▮% of all transactions were captured by the malware.

### (b) The Calculation of At Risk Cards

Some of the at risk cards were used more than once during the at risk time frame. Thus, the determination of how many cards could have been captured given the 21% daily capture rate becomes a function of the frequency of card usage over the affected time period, as follows:



Card used once: ▮% chance of avoiding capture
Card used twice: ▮% * ▮% = ▮%
Card used 3x: ▮%^3 = ▮%
Card used 4x: ▮%^4 = ▮%
Card used 5x: ▮%^5 = ▮%
Card used 6x: ▮%^6 = ▮%
Card used 7x: ▮%^7 = ▮%
Card used 8x: ▮%^8 ≈ ▮%
Card used 9x: ▮%^9 ≈ ▮%
Card used 10x: ▮%^10 ≈ ▮%

According to usage data provided by First Data, ▮ MasterCards were used during the at risk time frame.[12] A significant number—▮—were only used once. Based on the malware's known capture rate ▮ of those cards likely avoided capture. For cards used more than once, the appropriate total reduction based on the capture rate is calculated based on each tier's reduction, where a tier corresponds to the number of times a card was used over the affected period. The reduction calculated for each tier is as follows:

---

[11] The output files contained a "created" and "last modified" timestamp, which Schnucks used as the time frame for comparison to the total number of actual transactions.

[12] MasterCard's Final Acquirer Financial Responsibility Report gives the total number of accounts eligible for operational reimbursement or fraud recovery as ▮. First Data's frequency analysis was based on ▮ cards. This ▮% difference does not affect the calculation of the overall capture rate.

5



Total Number of Cards Not Captured = 300,596

Thus, after accounting for the capture rate and frequency of usage, the total number of at risk cards equals ▮% of the cards used during the at risk time frame. This analysis demonstrates that a ▮% reduction in the number of eligible accounts identified by MasterCard is required—a reduction from ▮ to ▮.

(c) Reduction in Operational Reimbursement

The Operational Reimbursement liability MasterCard has assessed in reliance on the incorrect number of eligible accounts of ▮ is $▮. This equates to liability on a per card basis of $▮. By using the correct number of at risk cards (▮) and applying the per card amount of $▮, the calculation of the Operational Reimbursement would amount to only $▮ (a reduction of $▮).

(d) Reduction in Fraud Recovery

The Operational Reimbursement liability MasterCard has assessed in reliance on the incorrect number of eligible accounts of 554,125 is $▮. This equates to liability on a per card basis of $▮. By using the correct number of at risk cards (▮) and applying the per card amount of $▮, the calculation of the Fraud Recovery would amount to only $▮ (a reduction of $▮).

(e) Reduction in Case Management Fee

According to Table 7.2 of the Account Data Compromise User Guide, the case management fee for events involving 100,001 - 500,000 cards is $100,000, and the fee for events involving 500,001 - 1,000,000 cards is $150,000. Because the number of at risk cards cannot exceed ▮, properly calculated, the case management fee would be $100,000, not the $150,000 fee that MasterCard imposed.

(4) **Liability Premised on an Unfounded Number of Eligible Accounts Would Amount to an Unlawful Penalty.**

Setting aside whether MasterCard's assessments are otherwise enforceable in light of their structure and purported purpose, any assessment by MasterCard not based on the

6

forensic evidence regarding the actual number of at risk cards and in the absence of any evidence of actual theft would constitute an unenforceable penalty. *See Genesco, Inc. v. Visa U.S.A. Inc.; Visa, Inc. and Visa International Service Association*, 2013 WL 3790647, No. 3:13cv202 (M.D. Tenn. July 8, 2013) (denying Visa's motion to dismiss and finding that Visa's imposition of assessments without factual support and contrary to forensic evidence that not all cards were harmed by the breach could amount to an unlawful penalty). MasterCard has made no showing that the amount of assessed liability has any connection to any real loss. Indeed, assessing liability on a number of eligible accounts that is more than twice the number of cards that could have been captured bears no relationship whatsoever to any purported or threatened loss.

In *Genesco*, the merchant alleged that the assessment imposed by Visa as the result of a security breach constituted a penalty – rather than compensating Visa for actual damages – and therefore, was legally unenforceable. Genesco argued that the Visa assessment was not intended to compensate Visa, but instead was directed at compensating issuers. Because, however, the applicable contracts disavowed third-party beneficiaries, the court found that any such purpose was impermissible and that the only way the assessment could stand was if it were a valid liquidated damages provision. According to the merchant, however, the fraud recovery assessment was not based upon the forensic data, which allegedly showed that not all Visa accounts included in the assessment were compromised, and instead, the assessment amounted to a fixed amount of damages unrelated to actual loss. In denying Visa's motion to dismiss, the court found that because the assessment was based upon "possible risk of injuries in the event of a breach of a cardholder's data, without an actual theft of such data," the assessment was not based upon actual damages, but rather could amount to an unenforceable penalty.

The rationale of the *Genesco* decision applies with equal force to MasterCard's imposition of liability here. Indeed, to withstand scrutiny, the liability assessments for Operational Reimbursement, Fraud Recovery, and case management fee must pass muster as liquidated damages. They cannot. Under New York law "[a] liquidated damages clause is appropriate only in those situations "where it would be difficult, if not actually impossible, to calculate the amount of actual damage." *Truck Rent-A-Ctr. v Puritan Farms 2nd*, 41 N.Y.2d 420, 424 (1977). If the amount the parties agree would be owed as the result of a breach of the agreement "is plainly or grossly disproportionate to the probable loss," the provision is a penalty clause and will not be enforced. *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F.Supp.2d 296, 304 (E.D.N.Y. 2010).

(a) *Case Management Fee*

The total financial responsibility assessed by MasterCard includes a $150,000.00 case management fee. The case management fee is arbitrarily set by MasterCard and bears no relationship to any alleged loss. Rather, it is based on the total number of cards that MasterCard determines (in its sole discretion) are at issue. The fact that the case management fee would have been $75,000 instead of $150,000 if Schnucks' acquirer reported the event first further highlights the arbitrary nature of the fee. Finally, the fact that MasterCard keeps 3% of Operational Reimbursement and 5% of Fraud Recovery for

7

the expense it incurs in administering the assessment process also demonstrates that the case management fee is not intended to be a recovery of MasterCard's expenses.

*(b) Operational Reimbursement & Fraud Recovery*

Moreover, the operational and fraud recovery assessments are grossly inflated for the same reason—they are based on the arbitrary and unsupported decision by MasterCard that all MasterCard accounts used at ▇ Schnucks locations during the at risk time frame were compromised, notwithstanding the compelling evidence that ▇% of all transactions each day would not have been written to a file by the harvesting script. Moreover, the PFI found no actual evidence that any card data was stolen from Schnucks' environment.

Further, this compromise involved only Track 2 data that was being stored by Retalix, a PA-DSS validated application that was, unbeknownst to Schnucks, storing that data in process memory in unencrypted format though the developers represent that it never stores data in unencrypted format. Most troubling, however, is that, as discussed above, MasterCard was aware in January 2013, if not earlier, that attackers were targeting payment applications like Retalix. Thus, to the extent that MasterCard can assert any damages arising from this incident, it failed to mitigate them.

For these reasons, the assessment in no way reflects MasterCard's purported damages from the incident. Rather, it amounts to an unenforceable penalty and should be rescinded.

**(5) The Total Liability Assessment Should Be Reduced Pursuant to Section 10.2.5.2.**

According to Section 10.2.5.2 of the Manual, MasterCard may consider "actions taken by the compromised entity to establish, implement, and maintain procedures and support best practices to safeguard MasterCard account data prior to, during and after the ADC Event or Potential ADC Event, in order to relieve, partially or fully, an otherwise responsible Customer of responsibility for any assessments, ADC operational reimbursement, ADC fraud recovery and/or investigative costs." In addition, MasterCard may consider factors such as compliance by all third party payment applications used by the compromised entity; notification of an event to and cooperation with MasterCard and, as appropriate, law enforcement authorities; verification that the forensic investigation was initiated within 72 hours of the event and completed as soon as practical; and timely receipt by MasterCard of the unedited forensic examination findings. Weighing all of these factors compels the conclusion that the financial responsibility should be eliminated or substantially reduced.

The efforts of Schnucks that compel this reduction include:

- Schnucks was validated as PCI DSS compliant in November 2012 by its QSA, just weeks before the attacker began harvesting card data.
- This was the first account data compromise event experienced by Schnucks.

8

- After receiving the first informal notice from First Data of a potential issue affecting 12 cards used in one store, Schnucks took immediate steps to investigate and rule out a malicious employee or card-skimmer as the cause.
- Before Schnucks was asked by the card associations to engage a PFI, Schnucks had already contacted Mandiant.
- Schnucks immediately engaged Mandiant to officially serve as the PFI when requested, and quickly brought Mandiant on site to begin its investigation.
- Once Mandiant made Schnucks aware that its systems may have been compromised, Schnucks worked with Mandiant to develop and implement a containment plan within 48 hours that blocked the attack from continuing.
- Schnucks worked with Mandiant to identify the at risk cards so that the card associations could take steps to prevent fraud on those accounts.
- Schnucks has implemented all of the remediation recommendations identified by Mandiant in its Final PFI Report.
- Schnucks has engaged a new QSA and is quickly working to re-validate its compliance with PCI DSS.
- Schnucks is also engaged in discussions with its processor, payment application vendors, and consultants to identify and implement a tokenization solution that would completely remove plain text card data from its environment.
- And when considering whether the attack was reasonably avoidable by Schnucks, it is important to note that Schnucks was using a PA-DSS validated processing application that the card associations knew was being targeted. To the extent this compromise was reasonably avoidable, the card associations failed to provide Schnucks with the information it needed to avoid it.

Schnucks fully complied with the letter and spirit of Section 10.2.5.2, and MasterCard would abuse its discretion by failing to factor that into its assessment.

CONCLUSION

Based on the foregoing, Schnucks respectfully requests that MasterCard rescind its liability assessment and case management fee.

Very truly yours,

Craig A. Hoffman

cc: Louis Sablich, First Data
Mary Moorkamp, Esq. Schnucks
Brian Brink, Esq. Schnucks
Ted Kobus, Esq. BakerHostetler